C5g2ace1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ACETO AGRICULTURAL CHEMICALS
CORPORATION,

                    Plaintiff,

          v.                              10 CV 1770(AJN)

BAYER AKTIENGESELLSCHAFT,

                    Defendant.

------------------------------x
                                        New York, N.Y.
                                        May 16, 2012
                                        9:30 a.m.

Before:

                    HON. ALISON J. NATHAN,

                                        District Judge

                         APPEARANCES

PATTISHALL MCAULIFFE NEWBURY HILLIARD & GERALDSON,LLP
     Attorneys for Plaintiff
BY:  ROBERT M. NEWBURY
     PHILLIP BARENGOLTS

HOLLAND & HART, LLP
     Attorneys for Defendant
BY:  TIMOTHY P. GETZOFF, P.C.

Also present:  Randy A. Myers, Ph.D., Bayer Crop Science
               Michael W. Feinman, Aceto President

C5g2ace1

1              (In open court; case called)

2              THE COURT:  Please be seated.

3              Continued trial in this matter.  Mr. Kippley is on the

4    witness stand for direct examination, which will continue.

5              Mr. Kippley, I remind you that you are under oath.

6    Thank you.

7              THE WITNESS:  Yes, your Honor.

8              THE COURT:  Go ahead, Mr. Getzoff.

9              MR. GETZOFF:  Thank you, your Honor.

10   DIRECT EXAMINATION

11   BY MR. GETZOFF:

12   Q.  Good morning, Mr. Kippley.

13   A.  Good morning.

14   Q.  Talking about the Proline 75 herbicide product from Aceto,

15   what time of year do the growers and farmers apply this

16   product?

17   A.  Springtime.

18   Q.  Why is that?

19   A.  Because the weeds that you control come just after the

20   ground has been tilled in preparation of planting your crop.

21   The weeds will come right behind that.

22   Q.  Now, did you hear yesterday Dr. Myers talk about how timing

23   of the application of crop protection products is important?

24   A.  Yes.

25   Q.  Do you agree with that?

1    A.  Yes.

2    Q.  Do you agree that there are certain windows of application,

3    so that for sedge control you have got a window in the spring

4    to apply it; and, in the case of Profine, you have a window

5    later in the year for controlling diseases?

6    A.  Yes.

7    Q.  Is Profine 75, is this a type of product that farmers would

8    keep in stock or keep on hand, like they would, say,

9    fertilizer?

10   A.  No.

11   Q.  Why not?

12   A.  This is a product, and I think we talked about this

13   yesterday, again, one of the reasons that we decided to bring

14   on the generic of this product is that it is really

15   specialized.  So the only time you really use this is when you

16   have a severe infestation of sedge.

17          Dr. Myers mentioned yesterday there are a lot of

18   different herbicides, and many of them do have some suppression

19   or some ability to control sedge.  But if you have a very bad

20   problem, you are going to add this molecule or the Profine 75

21   to your program.

22   Q.  Mr. Kippley, I want to have you take a look at -- I am

23   going to change gears on you and have you take a look at

24   Exhibit 5, Aceto's Exhibit 5 in the notebook.

25          What is Exhibit 5?

C5g2ace1                        Kippley - Direct

1   A.  This is a sale invoice for Profine 75.

2   Q.  What is the date of this invoice?

3   A.  The date of the invoice is March 24, 2009.

4         MR. GETZOFF:  Your Honor, we offer Aceto's Exhibit 5

5   into evidence.

6         MR. NEWBURY:  No objection, your Honor.

7         THE COURT:  Thank you.  Aceto Exhibit 5 is admitted.

8         (Plaintiff's Exhibit 5 received in evidence)

9   BY MR. GETZOFF:

10  Q.  Mr. Kippley, is this invoice, is this how, is this

11  generally how Aceto's invoices for the Profine 75 product look?

12  A.  Yes.

13  Q.  Is this the first invoice that -- the first sale of Aceto's

14  Profine 75 product?

15  A.  This was our first sale, yes.

16  Q.  Take a look at Exhibit 8, please.  What is Exhibit 8,

17  Aceto's Exhibit 8?

18  A.  This is a copy of the Profine 75 label.

19  Q.  Is this the same -- this is a multipage document.  It goes

20  from Bates number Aceto 61 through Aceto 168.  On the last page

21  there is also a separate page number saying 108 pages.  Did I

22  get that right?

23  A.  Yes.

24  Q.  Is this the same content that if you look at Aceto's

25  Exhibit 28, the actual bottle in front of you, is contained in

1    the plastic folder that is affixed to the cap?

2    A.   Yes.

3    Q.   Although in bigger format?

4    A.   Yes.

5           MR. GETZOFF:  Your Honor, we offer Exhibit 8 into

6    evidence.

7           MR. NEWBURY:  No objection, your Honor.

8           THE COURT:  Thank you.  Aceto Exhibit 8 is admitted.

9           (Plaintiff's Exhibit 8 received in evidence)

10   BY MR. GETZOFF:

11   Q.   Mr. Kippley, could you look at Exhibit 6, please, Aceto's

12   Exhibit 6.  This is a four-page document of pictures.  Can you

13   identify them, please?

14   A.   These are pictures of our Profine 75 packaging.

15   Q.   Is this the box that the bottles, that Exhibit 28 would

16   come in?

17   A.   That's correct.

18   Q.   If you look at the last page of Aceto's Exhibit 6, does

19   this show that there are nine bottles that would fit in a full

20   box?

21   A.   Yes.

22   Q.   One is missing in that material?

23   A.   Yes.

24          MR. GETZOFF:  Your Honor, we offer Exhibit 6 into

25   evidence.

C5g2ace1                          Kippley - Direct

1                MR. NEWBURY:  No objection, your Honor.

2                THE COURT:  Thank you.  Aceto Exhibit 6 is admitted.

3                (Plaintiff's Exhibit 6 received in evidence)

4    BY MR. GETZOFF:

5    Q.  And just for clarification, is this how the boxes always

6    looked, the depictions in Aceto's Exhibit 6, is this how the

7    boxes always looked --

8    A.  Yes.

9    Q.  -- when the boxes are shipped?

10   A.  Yes.

11               THE COURT:  I ask for similar clarification on Exhibit

12   8, which is the Profine label.  Has that label changed over

13   time?  Is this a current label?  Has it remained the same since

14   Profine was introduced?

15               THE WITNESS:  It's remained the same.

16               THE COURT:  Thank you.

17   BY MR. GETZOFF:

18   Q.  Mr. Kippley, let me have you look at Exhibits 2, 3, and 4.

19   Just to speed things along, these are sales reports.  These are

20   unobjected exhibits, these are sales reports of Aceto.  Is that

21   right?

22   A.  That's correct.

23   Q.  Showing sales of the Profine 75 product for the year -- for

24   the year stated in the document?

25   A.  Yes.

1          MR. GETZOFF:  Your Honor, we offer Exhibits 2, 3 and 4

2     into evidence.

3          MR. NEWBURY:  No objection.

4          THE COURT:  Okay.  Thank you.  Aceto 2, 3, and 4 are

5     admitted.

6          (Plaintiff's Exhibits 2, 3, and 4 received in

7     evidence)

8     BY MR. GETZOFF:

9     Q.  Aceto's Exhibit 11, Mr. Kippley, could you identify what

10    Aceto Exhibit 11 is?

11         THE COURT:  Sorry, my copies of 2, 3, and 4 -- well, 4

12    I can read the date, I cannot read the date on 2 and 3.

13    BY MR. GETZOFF:

14    Q.  Mr. Kippley, let's take a look at Exhibit 2.  Does --

15         THE COURT:  I mean just the date in the upper

16    right-hand corner.  I can read the period date.

17    Q.  Let me just ask this question.  Mr. Kippley, there is a

18    date in the upper right-hand corner and a time, but then there

19    is a range of dates for period one and period two.  What is the

20    difference?

21    A.  Well, the upper right-hand corner looks like when you

22    three-hole punched it, you punched out the day.  That's the

23    date when you printed the report.

24    Q.  Okay, so --

25    A.  And then --

1   Q.  Please continue.

2   A.  Then if you go where it says period one and period two,

3   basically the computer report says, well, those are the sales

4   between those periods.

5          THE COURT:  Thank you.

6   Q.  Back to Exhibit -- Aceto's Exhibit 11, Mr. Kippley.

7   A.  So this is a sales spreadsheet that we are using to look at

8   the sales of Profine 75 by customer and by ship-to location.

9   Q.  So did a customer -- I see three customers on the left-hand

10  column.  Are those the three distributors that we have heard

11  testimony about that are the direct customers for the Profine

12  75 product?

13  A.  Yes, those are the distributor customers.

14  Q.  What is the location --

15  A.  So these are locations where these are the retail locations

16  that we would ship the product into that -- where it, in turn,

17  gets sold to the farmer.

18  Q.  Does this cover sales for 2009 and most of 2010?

19  A.  Yes, that's correct.  We are basically looking here saying

20  what did we sell in 2009; and then as we are entering into

21  2010, we wanted to make sure that customers who bought or

22  retail locations that received products from us the year

23  before, that we are making sure that they were reordering the

24  product.

25          MR. GETZOFF:  Your Honor, we offer Aceto's Exhibit 11

C5g2ace1                          Kippley - Direct

1      into evidence.

2                  MR. NEWBURY:  No objection, your Honor.

3                  THE COURT:  Aceto Exhibit 11 is admitted.

4                  (Plaintiff's Exhibit 11 received in evidence)

5      BY MR. GETZOFF:

6      Q.  Mr. Kippley, we heard yesterday that Bayer has a number of

7      pesticide products, fungicide and insecticide and herbicides

8      that use P-R-O, "pro," as the prefix.  To your knowledge, is

9      Bayer, aside from Aceto's Profine 75 product, is Bayer the only

10     product that uses "pro" as a prefix for crop protection

11     products?

12     A.  No, there are other products in the industry that use that

13     P-R-O.

14     Q.  Could you take a look at Aceto's Exhibit 27, please.

15     Aceto's Exhibit 27 is, I think, 25 or so pages of what looks

16     like labels, different labels.  Can you identify these for us,

17     please.

18     A.  Yes.  First one is ProCon-Z.

19     Q.  If you could just flip through these, I don't want to spend

20     a ton of time on this, because there are so much pages, but

21     generally what is contained in Exhibit 27?  And let me say for

22     the record that this was a deposition exhibit, so at least my

23     copy says Exhibit 21 in the lower right-hand corner, but that's

24     erroneous for purposes of this trial exhibit.  It is Aceto's

25     Trial Exhibit 27.

C5g2ace1                        Kippley - Direct

1           Let me repeat my question.  Mr. Kippley, could you go

2       through this and just briefly explain what all these documents

3       are?

4       A.   Okay, sure.  So we are looking at ProCon-Z fungicide.  It

5       is a fungicide for sale in the market.  The next one is

6       insecticide.  The name is Proclaim from Syngenta.  The next one

7       is from Dow Agro.  It is a fungicide, PropiMax.  The next one

8       is a Prometryne herbicide.  We have a product from Agriphar

9       company called Promess fungicide.  There is another product,

10      ProFume.  It's a fumigant.  Another product is ProDeuce, which

11      is an herbicide.  We have ProClipse from Nufarm, which is

12      another herbicide product.

13      Q.   Let me stop you, Mr. Kippley.  Are you familiar with these

14      companies, Dow and Nufarm, and Loveland, that are -- Syngenta

15      is the second one for Proclaim, that are selling these

16      products?

17      A.   Yes.  These are all major companies in our industry.

18           MR. GETZOFF:  I am just going to, I think -- first,

19      let me offer Exhibit 27 into evidence, your Honor.

20           MR. NEWBURY:  No objection, your Honor.

21           THE COURT:  Aceto 27 is admitted.

22           (Plaintiff's Exhibit 27 received in evidence)

23           MR. GETZOFF:  Your Honor, I wasn't going to have Mr.

24      Kippley do anything other than go through and read them, but it

25      is self-evident.

C5g2ace1                           Kippley - Direct

1          THE COURT:  I have got it.  Thank you.

2          MR. GETZOFF:  Thank you.

3          Thank you, Mr. Kippley.  I have nothing further.

4          THE COURT:  Mr. Newbury, you may cross.

5    CROSS EXAMINATION

6    BY MR. NEWBURY:

7    Q.  Mr. Kippley, let's start with Exhibit 27 you were just

8    dealing with.  Where did you get those labels?

9    A.  These are all available on CDMS.

10   Q.  What is CDMS?

11   A.  CDMS is the industry database that all of the manufacturers

12   are not required but are encouraged to put their labels on so

13   that everybody in the industry can look up these products and

14   the labels and how the products are used.

15   Q.  Do you know the extent of the use of any of those products?

16   A.  I don't understand your question in terms of --

17   Q.  Do you know the extent to which companies use any of -- use

18   those labels?  Do you know the amount of sales that any company

19   has under --

20          THE COURT:  You mean with reference to the labels

21   contained in Exhibit 27?

22          MR. NEWBURY:  Yes, your Honor.  I am trying not to do

23   this one at a time.

24          THE COURT:  I appreciate it.  I just wanted to make

25   sure.

C5g2ace1                          Kippley - Cross

1   Q.  That's exactly what I mean.

2   A.  So if you are asking me do I know the annual sales volume

3   of the products that we just talked about, I do not know the

4   annual sales volume of the products that I just read.

5   Q.  Do you know if any of them are advertised at all?

6   A.  No, I do not.

7   Q.  Do you know how long they have been in use?

8   A.  Just to go back to, I know if they are advertised, I have

9   seen ads for a couple of these products, but -- and then your

10  second, question, please, is how long have they been used?

11  Q.  Do you know how long they have been used?

12  A.  No, I do not.

13  Q.  Turning to your Profine product, do you ordinarily refer to

14  Profine simply as Profine when you are communicating with

15  customers?

16  A.  We will sometimes, I think, as you saw in our invoices we

17  invoice as Profine 75, but many times we do use just the word

18  Profine.

19  Q.  Now, my question was do you ordinarily refer to it that way

20  when you are referring to customers?

21  A.  Yes, I typically refer to it as Profine.

22  Q.  Do customers refer to it that way back to you?

23  A.  Yes, they do.

24  Q.  Most people you hear simply refer to the product as

25  Profine.

C5g2ace1                              Kippley - Cross

1    A.  That's correct.

2    Q.  When you were with Monsanto, you visited with farmers, is

3    that correct?

4    A.  Yes.

5    Q.  When was that?

6    A.  19 -- I was employed by Monsanto 1988 -- well, 1986 through

7    1990.  So I was visiting farmers throughout my tenure with the

8    company.

9    Q.  Where were you employed after that?

10   A.  I was employed by the Oil Dry Corporation.

11   Q.  Did you visit with farmers then?

12   A.  Yes, I did.

13   Q.  Did you visit with farmers for Aceto?

14   A.  Yes.

15   Q.  Do you recall giving a deposition in this case?

16   A.  Yes.

17   Q.  Do you recall telling us there that you don't really talk

18   to farmers because the distributors would be upset if you did?

19   A.  That's correct.

20   Q.  Is that a true statement that you don't really talk to

21   farmers?

22   A.  That's correct.

23   Q.  Did you also tell us that you never visit farms and don't

24   know how Profine is applied to crops?

25   A.  I don't recall making that statement.

C5g2ace1                              Kippley - Cross

1              (Pause)

2              THE COURT:  Do you have copies for the court and

3    witness?

4              MR. NEWBURY:  Yes, I do, your Honor.

5    BY MR. NEWBURY:

6    Q.  I invite your attention to page 74, Mr. Kippley.  Reading

7    from line 7 of your deposition --

8    A.  Just one moment, please.  Okay.

9    Q.  "In your position now, do you ever go out to growers to

10   promote Aceto's products?

11   "A  No."

12             Was that truthful testimony?

13   A.  Yes.

14             (Pause)

15             THE WITNESS:  Can I comment?  Or --

16             THE COURT:  Do you want to ask further, Mr. Newbury?

17             MR. NEWBURY:  No, your Honor.

18             THE WITNESS:  Oh.

19   BY MR. NEWBURY:

20   Q.  Did you also tell us that you believe, in your testimony

21   that you believe the larger growers are sophisticated

22   purchasers?

23   A.  Yes.

24   Q.  I invite your attention to your deposition, page 148/line

25   14, reading questions, beginning on 14:

C5g2ace1                              Kippley – Cross

1              "In your experience, are growers, are some of them

2      less sophisticated or more sophisticated?

3      "A  I don't have contact with growers, so I can't comment.

4      Things changed a lot in the last 25 years.

5      "Q  Is it fair to say you don't know what the grower population

6      is like now?

7      "A  That's correct, I do not.

8      "Q  Is it fair to say that you don't know who specifically

9      applies Profine to crops at this time?

10     "A  I do not."

11             Do you recall being asked those questions and giving

12     those answers?

13     A.  Yes.

14     Q.  Was that truthful testimony?

15     A.  Yes.

16     Q.  So you don't know what the grower population is like now;

17     that is correct?

18     A.  Again, I don't recall all the other questions that were

19     asked prior to what is stated here.  I can only tell you that

20     my father is a farmer; that my cousin is a professional custom

21     applicator; that in the last six months I have been on farms;

22     that my definition of promoting the product, to my definition,

23     is to sell the product.  We do not sell to farmers, but I

24     regularly am on farms and am on places where the products, all

25     of our products are being used that, let's say, a consultant

C5g2ace1                    Kippley - Cross

1   that we are using.  But I am not selling to farmers.  I am not

2   promoting directly to farmers.  I certainly have knowledge of

3   what our product -- what's being used and who these people are.

4   Q.  Is it true that you don't have contact with growers now?

5   A.  I do have contact with growers now, specifically apple

6   growers is the most recent contact I have had a few months ago.

7   Q.  So your answer at the deposition -- was your answer correct

8   at the time of the deposition?

9          MR. GETZOFF:  Your Honor, can we have a page and line

10   for this particular --

11          THE COURT:  I assume he is talking about line 16 which

12   says "I don't have contact with growers."

13          MR. NEWBURY:  That is correct.

14   A.  Well, the thing is, at the time of the deposition, it may

15   have been some time since I was actually talking to growers,

16   but in the last six months we were involved with an apple

17   product, where we were in touch with growers, evaluating plots.

18   Q.  Does the apple product use Profine?

19   A.  No, it does not.

20   Q.  And it wouldn't use Proline either, would it?

21   A.  I am not familiar if Proline is registered for apples.

22   Q.  At the time of your deposition, it is true that you didn't

23   know what the grower population is like now, isn't that

24   correct?

25   A.  If it is talking about in general context of growers and

C5g2ace1                         Kippley - Cross

1    applicators throughout the United States, I still have general

2    awareness of that.

3    Q.  And that goes back to 25 years ago with Monsanto?

4    A.  Well, Monsanto and my weekend visits to my family farm and

5    to just a recent visit to apple orchards in upstate New York

6    that we are launching.

7    Q.  The family farm was a dairy farm, is that correct?

8    A.  That's correct, but they raise corn and soybeans and other

9    products; and, as I mentioned, my cousin is a commercial

10   pesticide applicator.

11   Q.  Going back to Exhibit 27 again, that's the third-party

12   uses, are any of those uses, are any of those trademarks

13   similar as similar as Proline is to Profine?

14   A.  Many of them, again, have the P-R-O.  Some of them have the

15   same number of words.  But, no, none of them are different by

16   one letter.

17   Q.  Now, inviting your attention to Defendant's Exhibit 11, did

18   I understand you correctly this shows where at the time of this

19   exhibit your Profine product was sold?

20   A.  Yes, that's correct.

21   Q.  The product was sold in Pennsylvania?

22   A.  Yes, that's correct.

23   Q.  Also in New York, Indiana, and Wisconsin?

24   A.  That's correct.

25   Q.  If I can invite your attention back to your Exhibit 1, that

C5g2ace1                           Kippley - Cross

1    is, Aceto's Exhibit 1, it is the file of your trademark

2    application.

3              Do you have that?

4    A.  Yes, I do.

5    Q.  It was on the basis of this file that you decided your

6    trademark was -- you were good to go with use of Profine?

7    A.  Earlier communication that we had that it was good to go.

8    Q.  Did you read this file?

9    A.  No, I didn't read the file.

10   Q.  I invite your attention to the first page of that file.

11             THE COURT:  Mr. Newbury, you mean page one of the

12   exhibit?

13             MR. NEWBURY:  Yes.

14   Q.  Do you see the language -- did you ever read this page

15   before?

16   A.  You mean the link that is listed on the card?

17   Q.  Did you ever read the page before, the first page of the

18   Exhibit 1?

19   A.  Yes.

20   Q.  Did you read that -- then you noticed that it told you that

21   the mark was going to be published in the official gazette?

22   A.  Yes, April 21.

23   Q.  And it also told you that any party who believes that they

24   will be damaged by registration of the mark may oppose its

25   registration by filing an opposition to registration?

C5g2ace1                    Kippley - Cross

1    A.  Yes.

2    Q.  And you understood that if an opposition were filed, you

3    would not receive your registration?

4    A.  I didn't understand that if somebody opposed I would not

5    receive it, but only that somebody opposed it.

6    Q.  Did you wait to see if somebody would oppose it before you

7    began use?

8    A.  No, because all of our indications is that there wasn't a

9    problem at all with the mark, and that's why we proceeded

10   forward to commercialize and begin sale of the product.

11   Q.  And you continued to so proceed after somebody did oppose

12   it, isn't that true?

13   A.  Yeah, we had already -- by the time we had learned or

14   received a letter from Bayer that they opposed the mark, based

15   upon the previous information that there was not a problem with

16   the mark, we had already packaged and branded and shipped and

17   sold the product, and the product was already being applied by

18   the time we received word that there was opposition, that

19   somebody felt there was a problem with the mark.

20   Q.  If you had waited to see if there were an opposition, would

21   you have taken all those steps?

22   A.  Well, we would have missed a season.

23   Q.  So it was really the fact that you needed to be out for the

24   season that caused you to proceed?

25   A.  And that we were aware at the time that there was no

1    competing marks, that everything was in order.

2    Q.  You weren't aware that everybody would agree with that and

3    nobody would file an opposition.

4    A.  At the time we had no indication that there was a problem.

5    Q.  Did you have any indication that nobody would file an

6    opposition?

7    A.  We had an indication that there were no marks and that

8    there wasn't a problem.

9    Q.  That was based on your communication from Ms. Strazzo?

10   A.  That's correct.  And the fact that we had word that PTO

11   approved the mark.

12   Q.  Mr. Kippley, do you recall preparing and signing a trial

13   declaration when this case was before Judge Berman?

14   A.  Yes, I do.

15   Q.  And you signed that under penalty of perjury?

16   A.  Yes.

17   Q.  And I assume you read it very carefully before you signed

18   it?

19   A.  Yes.

20   Q.  I am going to hand you a copy of your declaration.

21           I invite your attention to page five of that trial

22   declaration, and particularly to the final sentence appearing

23   in the incomplete paragraph at the top.

24           Do you see that?

25   A.  The last paragraph.

C5g2ace1                              Kippley - Cross

1   Q.  Particularly the language, "To my knowledge, Aceto's

2   Proline 75 herbicide is not sold from any of the same outlets

3   or used by the farmers" -- "same farmers that use or buy

4   Bayer's Proline fungicide."

5          Do you see that?

6   A.  Let me find where you are at here.

7   Q.  Page five, the last sentence at the top of the paragraph --

8   at the end of the first paragraph.

9   A.  "Ms. Strazzo also works with attorney Joe Kaufman."

10  Q.  No, page five.

11  A.  Page five.

12         THE COURT:  It is the ride-over paragraph at the top

13  of the page.

14         THE WITNESS:  Oh, I'm sorry, top of the page.

15  Q.  Thank you.  That was the description I was trying --

16  A.  Sorry.

17         THE COURT:  Take your time and read it, if you would

18  like.

19         THE WITNESS:  Yes.

20  A.  "We do sell a small amount of Profine 75 in Wisconsin for

21  vegetables that are grown there to my knowledge."

22  Q.  No.  The sentence --

23         THE COURT:  He is there now.  He is there now.

24  Q.  The last sentence.

25  A.  Oh, Aceto's Proline 75.  There is a typo here.

C5g2ace1                              Kippley - Cross

1  Q.  That's your mistake.

2  A.  That is correct.

3  Q.  And you made that in sworn testimony under penalty of

4  perjury.

5  A.  That's correct.

6  Q.  And that was because of the similarity of the marks.

7  A.  Or that the Proline was the sentence below.

8  Q.  I'm sorry.  I couldn't hear you, sir?

9  A.  Yes, or that the Proline sentence was listed below.

10           MR. NEWBURY:  I have no further questions, your Honor.

11           THE COURT:  Thank you.

12           Mr. Getzoff, any redirect?

13  REDIRECT EXAMINATION

14  BY MR. GETZOFF:

15  Q.  Mr. Kippley, Exhibit 11 shows sales of Profine 75 herbicide

16  to Pennsylvania, Wisconsin, Indiana, and New York.  To your

17  knowledge, are there vegetable crops grown in each of those

18  states?

19  A.  Yes.

20           MR. GETZOFF:  Thank you.  Nothing further.

21           MR. NEWBURY:  Nothing further, your Honor.

22           MR. GETZOFF:  Nothing from us, your Honor.

23           THE COURT:  Mr. Kippley, you may step down.  Thank

24  you, you are excused.

25           (Witness excused)

C5g2ace1

1          MR. GETZOFF:  Your Honor, I believe that concludes the

2     evidence.

3          THE COURT:  Thank you.  Would counsel like a short

4     break before you proceed to summation?  I'm sorry, do you have

5     a rebuttal?

6          MR. BARENGOLTS:  Your Honor, may we answer on the

7     rebuttal after the recess?

8          THE COURT:  No.  We will either finish up the

9     testimony or take a break.

10          MR. NEWBURY:  May we take a minute?

11          THE COURT:  You may take a minute.

12          (Counsel confer)

13          MR. BARENGOLTS:  Your Honor, we would like to take

14     about five minutes for a quick rebuttal, if that's all right?

15          THE COURT:  Okay.

16          MR. BARENGOLTS:  We would like to call Dr. Myers back

17     to the stand.

18          THE COURT:  Thank you.

19      RANDY A. MYERS,

20         called as a witness by the defendant,

21         having been duly sworn, testified as follows:

22     DIRECT EXAMINATION

23     BY MR. BARENGOLTS:

24     Q.  Dr. Myers, we just heard some testimony about the timing of

25     Profine application.  Can Profine and Proline be applied at the

C5g2ace1                          Myers - Direct

1    same time?

2    A.   Yes, they can.   Proline is used on a lot of different

3    crops, and it can be used any time from preemergent

4    application, when the furrow's opened and sprayed, when the

5    seed is placed in the ground.   We can spray it right after the

6    plant emerges from the soil all the way up until the preharvest

7    interval of whatever the particular crop is.

8            MR. BARENGOLTS:   Thank you, Dr. Myers.   That's all we

9    have.

10           THE COURT:   Mr. Getzoff?

11   CROSS EXAMINATION

12   BY MR. GETZOFF:

13   Q.   Dr. Myers, with respect to corn, didn't you testify that it

14   is applied late in the season, when the corn has reached a

15   certain height and growth development?

16   A.   For corn that is the case, yes.

17   Q.   What about dry beans?

18   A.   Dry beans, the application could be at any time after the

19   plant emerges from the soil.

20           MR. GETZOFF:   Thank you.

21           THE COURT:   Thank you, Mr. Myers.   You may step down.

22           (Witness excused)

23           THE COURT:   Anything further, Mr. Barengolts.

24           MR. BARENGOLTS:   No, your Honor.

25           THE COURT:   Mr. Getzoff?

C5g2ace1

1              MR. GETZOFF:  No, your Honor.

2              THE COURT:  Thank you.  Anything further before I give

3     you a ten-minute recess before summation?

4              MR. BARENGOLTS:  Nothing from Bayer, your Honor.

5              MR. GETZOFF:  Nothing from Aceto, your Honor.

6              THE COURT:  All right.  Thank you.  We will break for

7     ten minutes and then go to summation.

8              (Recess)

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C5G6ACE2                          Summation - Mr. Newbury

1              THE COURT:  So I think we decided Bayer are first for

2     30 minutes and Aceto for 35 if you wanted it and five for

3     rebuttal for Bayer.

4              MR. NEWBURY:  Thank you, your Honor.

5              THE COURT:  Go ahead, Mr. Newbury.

6              MR. NEWBURY:  May it please the Court, as Mr.

7     Barengolts told you in opening Bayer is here seeking protection

8     from likelihood of confusion.  This likelihood of confusion

9     takes two forms here.  One is the well, long-establish

10    trademark standard of likelihood of confusion as to source.

11    That is set forth in the statute, 15 U.S c., 1114 and many

12    cases.  It simply means as applied to this case that consumers

13    are likely to believe that Profine and Proline come from the

14    same source.  That source can be identified or it can be

15    thought to be Bayer.  It doesn't matter either way.  That

16    likelihood of confusion can occur at the point of sale or at

17    the time of sale or it can occur at any time after the sale.

18    Postsale confusion is recognized.  In other words, seeing the

19    products together at any time later, Oh, those come from the

20    same source, that is likelihood of confusion.

21             The other form of likelihood confusion in this case,

22    and the statute actually says likelihood of confusion,

23    deception or mistake is the mistake that could happen in the

24    application of the products.  That is, that the wrong product

25    will be used because of the similarity of the marks.

C5G6ACE2                    Summation - Mr. Newbury

1          Aceto's opening argument here and their evidence are

2     both largely devoted to claiming that no one would buy an

3     herbicide when they wanted to buy an insecticide.  But Bayer

4     never claimed they would.  Bayer simply claims that both would

5     be thought to come from the same source.  Aceto at this point

6     has yet to even address the issue of source confusion.

7     Probably the closest case on the facts here is a decisions by

8     Court of Customs and Patent Appeals, which is the predecessor

9     court to the current Federal Circuit Court of Appeals.

10         Aceto argued in its opening that you would never see

11    another case dealing with products regulated by these, but that

12    case dealt precisely with those products.  It considered an

13    agriculture insecticide against an agriculture fungicide.  It

14    is American Cyanamid Company v. United States Rubber, 356 F.2d

15    1008, a 1966 decision.  In that case Saigon, an insecticide,

16    sold as an emulsible liquid was held likely to cause confusion

17    with Cyanamid, a fungicide sold as a dry powder.  The goods

18    were specifically found to have a close relationship.  Same is

19    true here.

20         In this circuit, likelihood of confusion is determined

21    by the eight Polaroid factors.  It is not determined by

22    counting up who has five and who has three and deciding that is

23    the winner.  Different factors have different importance and

24    that can even vary tremendously from case to case.  It is a

25    balancing act enabling the Court to determine whether there is

C5G6ACE2                    Summation - Mr. Newbury

1    likelihood of confusion.

2              The first factor here is the strength of the mark.

3    That simply means the degree of distinctiveness, source

4    indication of the mark.  It can come from inherent

5    distinctiveness or required distinctiveness through substantial

6    use.  Both are present here.  There is no claim that Proline is

7    anything about distinctive.  Initially, it is registered.  That

8    confirms the distinctiveness.  Additional distinctiveness was

9    acquired through the long use and well over $100 million in

10   sales and extensive advertising.

11             Aceto has introduced some labels for third-party marks

12   claiming that weakens the pro part of Proline.  Aceto

13   introduced no evidence as to the extent of use or recognition

14   of those marks as to their sales as to whether anybody even

15   knows about them.  It can't have any effect on weakness without

16   being known.  That is well established by much precedent.  More

17   importantly, though, Bayer is not claiming similarity limited

18   to the pro part of its mark.  We don't claim exclusive rights

19   in pro.  This case is about the similarity between Proline and

20   Profine, the entire marks.  You don't dissect out part of the

21   mark.

22             The second factor is similarity of the marks.  This is

23   often said to be the most important factor.  Simply because if

24   there isn't similarity of the marks, there can't possibly be

25   confusion.  Here, the similarity was admitted by both Mr.

C5G6ACE2                         Summation - Mr. Newbury

Feinman and Mr. Kippley on the stand.  Not much of an admission

really because the similarity is obvious.  Proline and Profine

varied by one letter.  Aceto argued that the package

differences would distinguish the marks, but the farmer often

does not even see the package until after it has been

purchased.  The testimony is complete here that they are

ordered orally or by a written message that says, Buy Proline

or Buy Profine.

THE COURT:  Just to back up on that.  You are pointing

to Dr. Myers' testimony?

MR. NEWBURY:  Actually, I didn't but that is what I

was talking about, but also the prescription testimony that

Mr. Kippley gave where he said that it is like getting a

written prescription from the expert that they take it in.  But

I was also referring to Dr. Myers' testimony.  Sorry if I

pointed.  I simply took off my glasses and waved.

THE COURT:  No, it was wasn't because of that.  It was

just a clarification question.  I wanted to know what precise

testimony you were pointing to when you were speaking of when

you made the point about oral or written ordering detached from

a visual of the label.

MR. NEWBURY:  That's correct.

THE COURT:  And you are pointing to what you described

as Mr. Kippley's testimony regarding its being similar to

getting a prescription and Dr. Myers' testimony.

C5G6ACE2                    Summation – Mr. Newbury

1              MR. NEWBURY:  That's correct, your Honor.

2              THE COURT:  Go head.

3              MR. NEWBURY:  Moreover, a difference in the packaging

4       simply cannot overcome the overall similarity in the

5       trademarks.  It is a factor to be considered, but it doesn't

6       reduce the similarity of the trademarks.

7              The third listed factor, and this is probably the next

8       most important one, is the relationship.

9              THE COURT:  Sorry.  I should have said this in

10      advance, I do treat this a little like oral argument so if I

11      keep you substantially over your time for questioning, I will

12      be sure to give you more time and even it out.

13             On that last point, with respect to your two theories

14      of source confusion and product confusion, you just said that

15      the packaging difference doesn't particularly make a difference

16      with respect to similarity.  With respect to your theory of

17      product confusion, given that even after it is ordered it has

18      to be applied, and your theory is essentially that there will

19      be a misapplication of the products, what significance then

20      does the packaging and labeling have?

21             MR. NEWBURY:  Probably even less there than in the

22      source situation, your Honor.  The applicator will simply be

23      told, Put Proline on this product, and will mistakenly pick up

24      Profine.  There is no way to know if the applicator knows what

25      the packaging for Proline will look like.  He is only told the

C5G6ACE2                    Summation - Mr. Newbury

1    trademark.

2            THE COURT:  You are speaking of consultant applicators

3    or the applicators--

4            MR. NEWBURY:  Yes.  Both consultant applicators and

5    the farmers that ask their -- I am trying to think of a better

6    word than hired hand, but the hired hand to do it.

7            THE COURT:  What testimony or exhibits do you point to

8    on this and point?

9            MR. NEWBURY:  The mistake?  You heard in this

10   courtroom Mr. Getzoff made mistakes between Proline and

11   Profine.  You heard that Mr. Kippley made such a mistake in

12   sworn testimony.  If these sophisticated people can -- I can

13   make that kind of mistake.  Certainly an unsophisticated

14   applicator can clearly make the same kind of mistake when

15   Proline or Profine is mentioned or vice versa.

16           THE COURT:  I think in that answer you returned to the

17   point that the words Proline and Profine are similar?

18           MR. NEWBURY:  Yes, your Honor, that is the controlling

19   message here.

20           THE COURT:  I get that.  But there are other factors

21   and it is one thing to say that is an extremely strong factor

22   in your favor, but I want to make sure I understand your points

23   with respect to the other factors.  I also just want to

24   understand the point given your theory of product confusion

25   that someone will pick up the notion that someone will mean to

C5G6ACE2                    Summation - Mr. Newbury

1    apply Proline but will apply Profine instead, I want to make

2    sure I understand what testimony you are pointing to that would

3    suggest that the labeling and packaging and I suppose also the

4    physical nature of the products, dilution from a liquid versus

5    dilution from a tablet, what evidence suggests that the

6    similarity of words only would lead to a likelihood of

7    misapplication?

8            MR. NEWBURY:  If the hired hand is told to use Proline

9    on the product and hears Profine, he is just not going to

10   beyond looking at the label.  If he told to use Profine and --

11           THE COURT:  What testimony do you think --

12           MR. NEWBURY:  Again, I can refer to the mistakes made

13   here in court by sophisticated people.

14           THE COURT:  Anything else to point to?

15           MR. NEWBURY:  Just the unsophisticated nature of these

16   applicators that Dr. Myers testified about.

17           THE COURT:  I understand.  Thank you.  I think you

18   were ready to move to proximity.

19           MR. NEWBURY:  I was, your Honor.

20           The relationship of the product, probably the most

21   important.  No question these products are not competitive, but

22   they surely are closely related.  They are both agriculture

23   pesticides.  They are both used to increase crop yields.  They

24   pass admittedly through the same channels of trade, through the

25   same distributors that is, the same retail outlets to the same

C5G6ACE2                       Summation - Mr. Newbury

1    farmers.  The customers are all farmers.  Again, exactly the

2    same.  The same farmer could use both.  Both Dr. Myers and Mr.

3    Feinman talked about that.  They can be used on the same

4    crops -- dry beans, corn, rice.  I think I am leaving one out,

5    but those are the principal ones.

6         As Dr. Myers told you, fungicide and herbicide can

7    even be mixed together in the same tank and applied together.

8    The large marketers are known to make both products.  Aceto

9    makes both fungicide and herbicide.  So does Bayer.  The

10   customers expect these two types of products to come from the

11   same company.  When they see them with a similar trademark on

12   it, they will think that they come from the same company.

13        The next factor, likelihood that Bayer will bridge the

14   cap between fungicide and herbicide.  Well, that's certainly

15   not a factor here.  Bayer has already bridged the gap.  It

16   makes the same types of products.

17        THE COURT:  I am going to take you back to proximity

18   for a second.  I see that there are four crops, which both

19   products permissibly may be used on.  What evidence have you

20   put in that you can point me to that suggests that there

21   actually is overlapping use on any farm, or is this point built

22   on the possibility of overlap?

23        MR. NEWBURY:  Well, I think more the latter, your

24   Honor.  But Aceto uses a label which says the product can be

25   used on all those products.  If they didn't want it used on

C5G6ACE2                    Summation - Mr. Newbury

those products, they could have deleted them from the label.

They didn't do so.  They are telling the customer, You can use

it on these products.  If they didn't expect to be used on

those products, they wouldn't claim it on the label.

          THE COURT:  I think that as you said goes to the

latter, that there is the possibility of overlapping use.

          MR. NEWBURY:  I would go further and say probability.

          THE COURT:  What evidence makes it probable?

          MR. NEWBURY:  The fact that they are marketed for the

same products.  The label says you can do it.  If Aceto doesn't

expect a customer to do it would they make the claim on the

label?  They don't need to.  They can take it off.  Just

practicality.  If somebody doesn't expect something to happen,

why would you say you can make it happen?  It makes no sense to

do it any other way.

          THE COURT:  Again, I think this is framed within the

context of your theory of product confusion.  It is just a

question.  I understand the points that you made.  My question

is whether or not there is anything else you would point to to

suggest the likelihood or probability of someone actually

having the two products on the same farm meaning to use one but

using the other?

          MR. NEWBURY:  Again, you have the crop rotation

situation where you would have them on the same farm for

totally different crops and you have Dr. Myers' testimony that

C5G6ACE2                       Summation - Mr. Newbury

growers plant many different crops and they could have them

there in that situation.  One for use on one crop and the other

for use on a different crop and they would be in the same shed.

            THE COURT:  Thank you.

            MR. NEWBURY:  Now, I would say even if they weren't

used on the same crop, you still have a relationship between

the products.  These are agricultural pesticides that customers

know are made by the same companies.

            THE COURT:  Is this to source confusion?

            MR. NEWBURY:  Yes.

            THE COURT:  You will get to sophistication but with

respect to source confusion is your argument that one looks to

the farmhands for this point or to farmers and to the growers?

            MR. NEWBURY:  To everybody in the chain, your Honor.

            THE COURT:  Thank you.

            MR. NEWBURY:  The next factor is the likelihood that

Bayer will bridge the gap.  As I said, they already have.  Even

as to the particular products, Profine and Proline, Bayer has

bridged the gap.  Both originally could be used on dry beans.

Bayer expanded its use to corn and rice, again increasing the

overlap.  Bayer has concrete plans to expand Proline to -- I

never can pronounce this -- cucurbits --

            THE COURT:  I will recognize them as gords.

            MR. NEWBURY:  -- as soon as the EPA approval is

granted.  Thus, there is a very substantial overlap in products

C5G6ACE2                    Summation - Mr. Newbury

1     on which Proline and Profine can be used.

2              The the next Polaroid factor is the evidence of actual

3     confusion.  It is well settled that it is not necessary for

4     likelihood of confusion to have such evidence.  The reason is

5     simply evidence of actual confusion is recognized as being very

6     difficult to obtain.  One of the reasons why it is difficult to

7     obtain as to source confusion is that it is often because the

8     person who is confused doesn't know he is confused.  They

9     continue to believe the products come from the same source so

10    the confusion never comes to anybody's attention.

11             Another reason here is the relatively small sales by

12    Aceto and only three growing seasons in which there could be

13    actual confusion.  Mr. Feinman claimed there was $10 million of

14    claim without any documentary evidence to support that claim.

15    Aceto's own exhibits contradictive, Exhibits 2, 3 and 4, which

16    purport to show Profine sales for 2009, 2010, and 2011 total

17    only $3.2 million.  The documented figures seem to be more

18    reliable than the testimony here.

19             The final note on evidence of actual confusion relates

20    to the mistake theory in applying the wrong product.  That

21    probably would be reported because of the disastrous

22    consequences of such a thing happening.  However, even one such

23    instance, again because of those disastrous consequences, would

24    be and should be avoided if possible.  If this Court believes

25    that any such mistake is likely to happen, the fact that one

C5G6ACE2                    Summation - Mr. Newbury

1   has occurred at the present time is of no importance because of

2   the disastrous consequences we are talking about must be

3   avoided.  Again, this is repetition.  That such a mistake is

4   likely to happen is shown by the mistakes made by counsel and

5   Mr. Kippley in his sworn testimony.  If these sophisticated

6   people in court can mistake one for the other, certainly a

7   grower or an unsophisticated applicator can make the same

8   mistake.

9           In his opening argument Mr. Getzoff said that a slip

10  of the tongue in court is not important.  We agree.  A slip of

11  the tongue in court is evidence that a slip of the tongue out

12  of court and in the field could well occur particularly in the

13  hectic workplace of the growing season when the applications

14  are made.

15          The next factor is good faith in selecting of Profine.

16  The registration of Proline gave constructive notice to Profine

17  of the use of Proline.  Aceto never consulted an attorney in

18  clearing the mark.  Instead, it had a graphic designer make an

19  inadequate search and then took her opinion that the mark had

20  no conflicts.  The inadequacy of the search is that search

21  sought only identical marks to Profine.  It did not even

22  consider similar marks such as Proline.

23          Aceto made an attempt to show good faith by saying

24  they waited until the Patent and Trademark Office cleared their

25  mark, but Exhibit 1 showed the Patent and Trademark Office also

C5G6ACE2                    Summation - Mr. Newbury

1    notified Aceto that there was a possibility that someone would

2    oppose and they did not wait to see if someone opposed.  What

3    happened was they received the notice of the application and

4    simply went ahead without waiting to see if there was any

5    opposition.  Taking the halfway measure awaiting for the mark

6    to passes publication but not waiting to see whether it is

7    opposed is not evidence of good faith.

8            THE COURT:  But is the converse true, that it is

9    evidence of bad faith?

10           MR. NEWBURY:  No, your Honor.  There simply is no

11   evidence that there was good faith.

12           The next factor, the quality of the product, that is

13   Aceto's product or the damage that can be caused by the

14   product.  There is no argument here that Profine is not of good

15   quality.  However, the damage that could be caused by Profine

16   is potentially extreme.  We discussed this in connection with

17   the mistake factor before.  I won't repeat myself.  At least I

18   will try not to.

19           THE COURT:  I understand that it is the same point.

20           MR. NEWBURY:  As to source confusion, Bayer's

21   reputation is placed out of its control and there is source

22   confusion.  It is always a dangerous situation.  Any

23   dissatisfaction with Profine, whether justified or not, will be

24   attributed to Bayer and could affect all of Bayer's products.

25           THE COURT:  I want to make sure I understand the

1  distinction here.  If we're talking about source confusion and

2  not product confusion --

3          MR. NEWBURY:  Yes.

4          THE COURT:  -- if one can disaggregate the two

5  theories, if I can given the quality that you've conceded of

6  Profine 75, thinking of just source confusion for a moment, how

7  does this come up?

8          MR. NEWBURY:  Any number of ways.  The user just could

9  be unhappy with the results they get.  It doesn't mean it is a

10  rational belief.

11          THE COURT:  Here, I would look to the question of the

12  quality of the product in the abstract, not of mistaken

13  application, which is the quality of the product.

14          MR. NEWBURY:  That is the first thing you would look

15  to.  What this factor refers to is actually the damage that can

16  be caused by the association of confusion of the products.

17  Certainly we do not contest the quality of the product.

18          THE COURT:  Thank you.

19          MR. NEWBURY:  The last factor, the sophistication of

20  the purchasers.  All evidence about farm workers is that they

21  are not sophisticated.  You heard Dr. Myers at length about

22  that and there seems to be no disagreement.  They are certainly

23  not sophisticated about trademarks.  Same similar trademarks

24  put on agriculture pesticides will cause many to think they

25  come from the same source.  It just follows.  Farmers

C5G6ACE2                    Summation - Mr. Newbury

1    themselves are certainly not sophisticated about it, but they

2    are sophisticated about growing crops, not about trademarks or

3    the source of products.  Similar trademarks on related products

4    means they are likely to be thought to come from the same

5    source.

6         Mr. Kippley told you that the majority of farmers may

7    consult a professional about what product to use and the

8    professional rights something similar to a prescription as to

9    what product to use.  If you never seen a prescription that

10   testimony almost admits the likelihood of mistake.  If you

11   write a prescription, usually they are illegible.

12        THE COURT:  I hope farmers have better handwriting

13   than doctors.

14        MR. NEWBURY:  Well, there is no evidence of that and

15   doctor certainly don't.

16        In a handwritten prescription, it would be so easy to

17   mistake Proline for Profine.  The prescription also does not

18   reduce likelihood of confusion as to source.  Nothing in the

19   prescription says Proline and Profine do not come from the same

20   source.  Even if they get it right, the source of confusion is

21   still there.

22        Finally, Mr. Kippley testified that large farmers are

23   sophisticated purchasers.  That is simply contradicted by his

24   deposition as is his experience with farmers contradicted by

25   his deposition.  He told us totally different things in the

C5G6ACE2                    Summation - Mr. Newbury

1   deposition than he testified to on the stand.  The testimony he

2   gave before this Court is simply not credible.  It is totally

3   contrary to his deposition testimony.

4           Thus, balance on all the Polaroid factors leads only

5   to the conclusion that there is likelihood of confusion.  We

6   ask that you hold for Bayer in this action and issue an

7   injunction.  We also ask for accounting profits based on

8   Aceto's good faith in adopting and continuing to use Profine.

9           Thank you, your Honor.

10          THE COURT:  Thank you.

11          Whenever you are ready, Mr. Getzoff.

12          MR. GETZOFF:  Thank you, your Honor.

13          Your Honor, this is a case where there are not a lot

14  of facts in dispute.  The witnesses were generally in agreement

15  with what these products are, how they are sold, how they are

16  used, how they are applied, where they are sold from.  This is

17  more a case in terms of deciding the outcome of applying those

18  facts, applying that evidence to the relevant factors, which

19  include the Polaroid factors.  But of course the Polaroid

20  factors, as Polaroid said itself is a nonexhaustive list.  So

21  the Court can take into account whatever factors the Court

22  thinks might be relevant in this particular case to lead to the

23  ultimate determination whether a likelihood of confusion, not a

24  possibility of confusion, exists.

25          So let's talk about some of this evidence.  We have 38

C5G6ACE2                    Summation - Mr. Getzoff

1    months of concurrent sales from both products.  Millions of

2    dollars' worth.  Hundreds of million of dollars' worth of sales

3    on the part of Bayer and millions of dollars' worth on the part

4    of Aceto over that three years and two months and not a single

5    instance of confusion or mistake, either source confusion or

6    mistake.  I agree with the Court that these two theories I

7    think are two out branches of one overall theory, but I will

8    try to address them to the extent I need to in the course of my

9    argument.

10           Now, all of the witnesses agree that when a farmer has

11   a problem with a particular fungicide, the company hears about

12   it.  Bayer has a specific person whose job it is to field

13   complaints from farmers and growers with their customer.

14   Dr. Myers testified that when it has to do with one of his

15   fungicide products, he hears about it and consults with this

16   person.  Yet, we're in the fourth year, fourth season of

17   concurrent sales and no one has heard of any issues whatsoever.

18           Now, in absence of that length of time, that amount of

19   sales with no instances of any of the scenarios of mistake or

20   confusion that Bayer is proposing, Bayer could have done a

21   couple of things.  It is common in trademark cases for the

22   plaintiff to commission a trademark survey.  It is a common

23   technique.  You hire a survey expert and they go out and survey

24   the relevant public.  We know in this case who those people are

25   and we know where they shop and where they live because they

C5G6ACE2                    Summation - Mr. Getzoff

1    typically live on their farms.  And given that there are

2    hundreds of millions of dollars at stake for Bayer, why didn't

3    they get a survey?  Knowing that they have no actual confusion

4    in the fourth year of sales, why not get a survey to show

5    likelihood of confusion?

6           So we have no survey, no evidence of actual confusion

7    after all this time and all these sales and the question I have

8    is:  Is this surprising?  Is this surprising to us that we

9    haven't seen some instance somewhere of actual confusion or

10   mistake?  Well, I think the answer why we haven't seen any

11   instances flows from the rest of the evidence in terms of what

12   the nature of these products are, who buys them and how they

13   are applied.

14          Let's talk about the so-called strength of the mark

15   itself.  There are numerous products that start with pro in

16   this field.  Pro is ubiquitous.  There is 25 examples in

17   Exhibit 27 alone.  Bayer doesn't claim any exclusivity to pro.

18   In fact, Bayer itself has diluted this mark Proline by offering

19   a number of pro formative marks all for goods that are a lot

20   more similar to Proline than the Profine 75.

21          THE COURT:  Is your contention that Proline is not an

22   inherently distinctive mark?

23          MR. GETZOFF:  No, your Honor.  Inherent

24   distinctiveness just means it is not descriptive.  Proline is

25   not a word.  Proline has no dictionary meaning.

C5G6ACE2                    Summation - Mr. Getzoff

1          THE COURT:  So it is at least suggestive?

2          MR. GETZOFF:  It is at least suggestive right off the

3    bat.  Same with Profine, it is not a word.  If there is no

4    dictionary meaning, it has to be inherently distinctive.  It is

5    a protectable trademark from the first use.  It is not like

6    some descriptive word and you have to show some use to show

7    what we call secondary meaning.  That is not this case.  It is

8    inherently distinctive.

9          All trademarks are either inherently distinctive or

10   have acquired distinctiveness.  That doesn't mean they are

11   strong.  In this case when Bayer has a plethora -- these are

12   Exhibits 32, 33, 34 and 35 -- of other products all starting

13   with pro, and in the case of fungicide products Prosaro,

14   Provost, Propulse, they come in the same white two-and-a-half

15   gallon jug, they have the same trade dress with the green

16   background and they have will big Bayer double cross logo at

17   the top strongly identifying that the Bayer products come from

18   Bayer.  Bayer has a strong interest and takes great care to

19   identify itself, Bayer, the company with its particular

20   products and they have a slew of products that are all very

21   similar.  And if a farmer was storing these products, you would

22   have a bunch of these white two-and-a-half-gallon containers

23   all lined up with all these different brands and yet Bayer

24   isn't worried that consumers are going to have a slip of the

25   tongue and grab one bottle when they grab the other.

C5G6ACE2                    Summation - Mr. Getzoff

1            In fact, you heard Dr. Myers testify with respect to

2       the Proline product one of the reasons he is confident that no

3       mistake would get made is because he used a little circle

4       design for the "O" in Proline.  That circle design is not

5       contained in the labels for Provost or Propulse and he is

6       confident that that was his way to distinguish these.  Well, if

7       that distinguishes these, how does that reconcile Bayer's

8       entire position in this case that these products are purchased

9       sight unseen and no one sees the actual labeling and no one

10      reads the label and some low-level unsophisticated migrant

11      worker applies these without really connecting any dots to what

12      he is applying and what crops he is applying to and that is

13      Bayer's theory in this case.  Dr. Myers said, No, my circle

14      design that I came up with that is what we use to distinguish

15      my one fungicide pr product from Bayer in the

16      two-and-a-half-gallon container from the three others that we

17      have.  Obviously, your Honor, Profine does not have the circle

18      O design for pro.  None of the trade dress packaging of Profine

19      75 is remotely similar.

20           THE COURT:  I just want to understand how this

21      argument sort of fits doctrinally into the factors.  I see the

22      general point about confusion that you are making but at least

23      making an effort to go through the factors.  What authority is

24      there in thinking about strength of the mark for the position

25      you started with and then explain to me how you bring in the

C5G6ACE2                        Summation - Mr. Getzoff

evidence that you are referring to that just because it is a

suggestive mark and maybe because it has some secondary meaning

doesn't make it strong?  What do you point to for that?  And

then how does this point you are making about Dr. Myers'

testimony that they are not concerned about confusion of their

own products?  Doctrinally how does that fit?

        MR. GETZOFF:  So the first issue is if it is a

protectable trademark is it automatically strong.  That

essentially is the question I am hearing, which is if it is a

protectable trademark, which means by definition it is at least

suggestive doesn't that mean it is strong?  And the answer is

no.  Every trademark case starts with the first element:  Do

you have a protectable mark?  Which means is it at least

suggestive and a whole separate analysis is how strong is that

mark.

        THE COURT:  Right.  The analysis typically consists of

looking where it falls in the spectrum of generic and fanciful.

        MR. GETZOFF:  That's part of it.

        THE COURT:  And then the question of secondary

meaning.

        MR. GETZOFF:  Third party use I would say.  So there

are two elements of strength.  You are right.  What we call the

Abercrombie & Fitch factors, which was the original for that

spectrum.  You have strength in terms of is it semi

descriptive, which are weaker marks versus fanciful or

1    arbitrary marks and those are stronger in that sense, but you

2    also have what the cases talk about marketing strength.

3    Marketing strength is from the standpoint of the consumers how

4    distinctive is this mark, how much does this mark stand out

5    relative to what is out there.  Marks that are unique and there

6    are no other close marks and they stand out among the field,

7    those are strong marks and those are entitled to a broader

8    range of protection.

9           In contrast, marks that exist within a crowded field,

10   crowded field is sort of a term of art as us trademark nerds

11   use to say that you have a lot of similar marks and they all

12   have common elements in this same field, the field is crowded.

13   When the field is crowded like it is here, each mark is weaker

14   because it has a more narrow scope of protection.  Doctrinally

15   what Bayer has done by marketing a bunch of similar products

16   all under similar names is essentially weakened each of these

17   marks.  They could have put all their eggs in a pro-type mark

18   for one product and made that mark stand out.  That would have

19   made it stronger, but they essentially weakened that mark by

20   offering a number of marks.

21          In fact, they offer Prosaro a fungicide and Provado an

22   insecticide, which are almost as similar as Proline and Profine

23   75.  I would say they are certainly more similar in terms of

24   package because they both come from Bayer.  This comes in a one

25   gallon and this is liquid and it is a two-and-a-half-gallon

C5G6ACE2                          Summation - Mr. Getzoff

container.  They rhyme.  They are not worried about confusion

because they train their customers to look carefully at the

actual product name.  They are not worried that someone is

going to have a slip of the tongue, even though someone might

and say Provaro when they meant Pavado.  I may come in with

this so-called prescription and never look at the label and see

what I am applying and so forth.  But they are not worried

about confusion.  The reason they are not worried is that for

all these reasons we're talking about, these farmers pay

attention.  They have to pay attention.  This is their

livelihood.

          I am now moving into sophistication.

          THE COURT:  I will let you do that.  Do you have in

hand authority for the crowded field argument that you are

making?

          MR. GETZOFF:  Not in hand but it is close by, your

Honor.  I am certainly going to put it in the proposed

conclusions of law and findings of fact.  It is a well known

doctrine of strength of the mark.  You have essentially two

kinds of strength.  You have the arbitrary versus descriptive

spectrum of strength, but then you have what I think they call

is marketing strength, which is how distinctive is this mark.

How much does this mark stand out among in the field, and I

will provide that to the Court.

          THE COURT:  Go ahead.

1           MR. GETZOFF:  So moving on, and I did start to from

2     strength of the mark sort of started to slide into the

3     similarity of the mark.  So let me dive head on into similarity

4     of the marks.

5           Now, as anyone looking at the marks just the words in

6     a vacuum can tell, six out of the seven letters are the same.

7     The proper analysis for the Court to follow is not to compare

8     the words in a vacuum.  Instead the Court is supposed to look

9     at how these products, how these marks are viewed in the actual

10    marketplace, in the real world.  Not looking at two pieces of

11    paper and comparing Profine to Proline, but looking at all the

12    circumstances in the marketplace, including the trade dress,

13    packaging and everything else.  When you do that in this case,

14    the similarities just fall apart, your Honor.  The two

15    packaging for Profine 75 and Proline, I don't want to overstate

16    it, but they really couldn't be more different.  You have two a

17    big two-and-a-half-gallon container, which is a standard size

18    container for liquid pesticide products and you have a small

19    10-ounce bottle of granules.

20          Each product clearly says in the case of Profine 75 it

21    is a herbicide.  In the case of Proline it is a fungicide.

22    They are not saying that for no reason.  Number one, the EPA

23    requires that they say that and the reason the EPA requires the

24    product say that is because those words have special meaning in

25    this industry.  That is not saying one -- I am trying to think

C5G6ACE2                    Summation - Mr. Getzoff

of an analogy to some grocery store product where the seller

gets to make up the word or tagline that goes with the product.

Fungicide has specific meaning to this industry and to these

purchasers and growers as to what it is and what it does.  It

has specific meaning to the EPA as to what it is and does.

That is why EPA requires it.  Same with herbicides.

So the idea here, which would Bayer is proposing

someone would confuse a herbicide with a fungicide in this

market is not supported by the evidence.  When you realize the

distinct differences for which each of those productions do,

herbicide and fungicides mean two totally different things to

farmers.  No one would confuse in thinking, Oh, it is a

herbicide or fungicide.  It is one of those things.  No, no,

no.  Herbicides, fungicide, insecticide have three totally

different uses and are used and selected and purchased for

three totally different purposes by farmers.

I talked about this already but Bayer uses very

similar trade dress.  Bayer takes great pains as we seen

through their product to have a commonality among all the Bayer

products to sell their customers, our product comes from Bayer.

They put the big double cross at the top.  They use the chevron

design.  They use a color scheme for fungicide versus fungicide

and insecticide.  As Dr. Myers said he said in between the

categories he will add design elements to help consumers

distinguish between the two.  All of Bayer's efforts to

C5G6ACE2                        Summation - Mr. Getzoff

1    distinguish their products from their competitors makes these

2    products as distinguishable as possible from the Aceto product,

3    which has none of these design elements, none of the color

4    scheme, none of the trade dress elements.

5          Just from a quick visualization, whether they are

6    sitting on the same shelf, I don't believe the evidence shows

7    that customers, the growers stock these things in their sheds

8    season after season.  They are too expensive and tailored to

9    specific uses.  You buy the product when you need it and use

10   it.  You don't buy it and keep it on hand.  Let's assume they

11   are side by side at the same farm in the same shed, who can

12   confuse the Proline jug with the Profine 75?

13         THE COURT:  Well, take on the argument directly.  I

14   think the notion is something like:  The farmer says to the

15   farmhand, Go apply Proline, and the farmer hears Profine and

16   then goes hearing Profine and picks up a bottle of Profine.

17         MR. GETZOFF:  Yes.

18         THE COURT:  And then it doesn't matter what the

19   different labeling is, it doesn't matter what the different,

20   packaging is, it doesn't matter if it says fungicide or

21   herbicide.  They heard Profine when they should have said

22   Proline.  They pick up Profine and apply that mistakenly.  I

23   think that is at base the argument.

24         How do you counter that?

25         MR. GETZOFF:  You are right, your Honor.  I would

C5G6ACE2                    Summation - Mr. Getzoff

1    analogize that argument that that would be a good argument if

2    we were talking about a pack of gum at 7-Eleven because when I

3    send my 15-year-old daughter into the store to buy the gum and

4    I tell her the brand name, frankly there is a 50/50 chance she

5    is going to come out with the gum that I asked her to get.  I

6    verbally convey it to somebody who -- I will apologize to

7    Sidney -- is going to mix that up and come out with at wrong

8    pack of gum.  That is the situation they are trying to get us

9    to buy that the level of sophistication, the lack of care that

10   goes in to the actual application of these products, this is

11   not going into a store and buying a pack of gum.

12          At some point, and this is what this hypothesis

13   scenario doesn't take into account, at some point somebody has

14   to read the level.  At some point in this process.  They have

15   tried to eliminate as much as they can ever looking at the

16   product or ever looking at the label as much as they can.  But

17   at some point this is undisputed in this case that somebody has

18   to look at that label to know how to apply the product.  That

19   is not just an EPA federal law, which it is by the way, it is a

20   practical requirement, which is you need to know how to mix it,

21   how much to apply, how to apply it, what crops to apply it on.

22          THE COURT:  I still don't think that answers the

23   hypothesis, right?  Because if the hypothesis is, The farmer

24   says apply Proline and the farm worker hears Profine, they go

25   and get the Profine bottle, they can read the label and apply

C5G6ACE2                    Summation - Mr. Getzoff

1     it.

2               MR. GETZOFF:  Well, and apply it, what, to the wrong

3     crop?  So let's take this down.  That could only happen for the

4     overlap crops, number one.  So unless you are going to include

5     in that hypothesis that they are applying it to wheat, for

6     example, which is a common or one of the cereals which is a

7     common and big market for Proline, and the farmer is going to

8     tell a farmhand to go by Profine, he had a slip of the tongue,

9     and he goes to the ad retailer and that ad retailer probably

10    isn't even going to have Profine if it is North Dakota, but

11    let's assume that they do and the fact that they wanted a

12    fungicide and they received an herbicide, the scenario would

13    require that distinction never dawned on anybody, that I am

14    applying this because we have a fungus and I need a crop and I

15    need this for the focus and I am coming home with an herbicide.

16    That distinction, which is a significant distinction, gets lost

17    in this scenario.

18               It would have to be a dry bean farmer.  When this case

19    started, dry beans was the only overlapping crop.  Since the

20    case has gone on, Bayer added corn and then earlier this year

21    they added rice.  So on top of that, you would have to ignore

22    the fact that these are assisted purchasers.  These are

23    predominately -- and Dr. Myers talked about this -- purchases

24    where they go not ad retailer and the ad retailer typically is

25    guiding that purchase.  I mean, you just don't buy it off the

C5G6ACE2                         Summation - Mr. Getzoff

1    shelf.  This scenario, again like the gum analogy, would make

2    more sense if the person just picked it off the shelf, I heard

3    Profine, Profine was sitting on the shelf, I went and the

4    cashier rang me up and I was out the door.  That is not how

5    these purchases happen.  They are assisted purchases.

6          The Second Circuit case law is clear on this that when

7    you have a high degree of customer assistance in the purchases,

8    that takes the likelihood of confusion way down because the

9    chance for mistake when you get an herbicide and you meant to

10   get a fungicide, among other reasons.  Plus part of the

11   scenario presupposes that the farmer was familiar with Proline

12   and this is sort of goes to the source confusion, but it also

13   leaks over to the mistaken confusion is they have experience

14   and used Proline in the past and so when they ordered it the

15   next time they accidently said Profine and got in instead.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1              MR. GETZOFF:  So there they are supposing, then, that

2     the person who is actually the applicator, which are

3     professionals, I mean, there is this effort to sort of

4     denigrate these people as unsophisticated, and we are using --

5     we are misdefining "sophisticated" for purposes of trademark

6     law.  These people are sophisticated because they are

7     professionals.  They do this for a living.  This is not my

8     15-year-old daughter going in to get a stick of gum.  Again,

9     apologies, she is not sophisticated.  These people's jobs is to

10    do this.  They are paid to do this.  Whether they are farmhands

11    or migrant workers or the professional applicators that the

12    farmer hires, the ag retailer, to apply, these guys do this day

13    in and day out for a living.  That makes them sophisticated.

14             They have a warehouse stacked, as Dr. Myers said, from

15    the floor to the ceiling with ag products, ag products, ag

16    protection products, a lot of them which sound alike.  And the

17    idea that they are going to make this mistake and no one is

18    going to be the wiser and that it is -- it is sort of like the

19    person would have to be blind, deaf, and dumb to make this

20    mistake and get it all the way back to the field and apply it

21    and have that mistake happen.

22             Once you start to break down the series of events of

23    stars aligning for this to actually happen, this goes back to

24    my earlier point, your Honor, it is no surprise it hasn't

25    happened in four years.  This is the scenario of mistake which

C5g2ace3                    Summation - Mr. Getzoff

everyone agrees they would have heard about.  It is no surprise

it hasn't happened because it is just so unlikely.  It is so

unlikely.

         Is it possible?  Sure.  Anything is possible.  There

are misapplications of chemicals all the time.  Not because of

similarities in trademark.  People do grab the wrong bottle.

There are incompetent people once in a while that screw up a

crop application and they get fired because the farmer lost his

yield and heads are going to roll because the investment is so

high.  So it's not that could a mistake happen.  Is there a

possibility?  In this trademark case, is there a likelihood

that this could happen?  And, again, the reason we haven't seen

it yet is because it is not likely.  It is almost by definition

it is not likely.  If it was, we would have seen it.

         One other point I want to talk about on this issue

with respect to the overlap crops, which I think we agree

that's the only way this could even come out, Aceto sells

Halomax 75 for half the price of Profine 75 and rice and corn

and dry beans and a few other row crops are on the Halomax 75.

Halomax 75 is the row crop version of Profine 75.  So, again,

this scenario of mistake that Bayer is proposing further

assumes that a farmer would be, I don't want to say dumb, but

ignorant enough to spend twice as much as he would need to to

buy the wrong halosulfuron product.

         Mr. Newbury asked, well, we should just presume that

C5g2ace3                        Summation - Mr. Getzoff

1    because rice and corn and dry beans is on Profine 75 that it is

2    being used on that.  In addition to having no actual direct

3    evidence of that, the inference, which is what we are talking

4    about here, the inference is stronger that it is not applied

5    because it is just not an economically rational decision when

6    you have the row crop version, the Halomax 75, at half the

7    price, which is specifically marketed and pushed by the

8    distributors for those crops.  That is a much more likely

9    inference as to -- for these overlap crops.  It is not the

10   Profine 75 being applied or purchased.  It wouldn't be.  It

11   would be the Halomax 75 product.

12           Proximity between the products, this goes to my

13   earlier point on the difference between fungicides and

14   herbicides.  As Dr. Myers testified, Bayer itself keeps these

15   markets as distinct as possible.  The proximity between the

16   products, as the Second Circuit has said, the inquiry concerns

17   whether and to what extent the two products compete with each

18   other.  It is undisputed these products don't compete with each

19   other.

20           Generally the herbicides are applied -- well, it is

21   undisputed, Dr. Myers agreed, the Profine 75 is predominantly

22   applied on vegetables; and Dr. Myers also admitted that

23   vegetable crops are totally unrelated to the cereal crops and

24   row crops that the Proline is sold for.

25           The geography as to where these are sold, yes, there

C5g2ace3                    Summation - Mr. Getzoff

1    is some Proline sold in the south for peanuts.  Predominantly

2    it is sold in the north central plains, and that was evident

3    from the exhibits that Bayer produced in this case which, by

4    the way, is the only evidence they produced to us in this case

5    as to geography.  We have those maps showing that there is some

6    smatterings in the south; it's predominantly in the north.  In

7    the south it is for peanuts.  Peanuts is not a Profine 75 crop.

8    So those are different farms.

9            Likelihood of bridging the gap, the issue is what's

10   the likelihood that Bayer is going to start using Proline for

11   an herbicide?  That's the gap, that's the inquiry here is

12   bridging the gap when you have two different product

13   categories.  You have herbicide and fungicides that are totally

14   distinct, quote/unquote, as Dr. Myers said.  What's the

15   likelihood that Bayer's going to bridge that gap?  And the

16   evidence is that they won't.  There is no evidence that Bayer

17   is going to expand Proline to a totally different product

18   category of herbicides.

19           THE COURT:  Why is that in question, again, sort of

20   except taking their theory, and you have made the point that it

21   is not just a possibility of mistake, but a likelihood.  Isn't

22   the bridge gapping here the increase of that likelihood with

23   the increase of overlapping crop --

24           MR. GETZOFF:  Well, if they were going to -- let me

25   start with if the plan was that Bayer was going to move Proline

C5g2ace3                    Summation - Mr. Getzoff

1    into herbicides, that would take these products much closer

2    together.

3            THE COURT:  Right.  I understood that.  My question is

4    why is that the bridge to be gapped and not a bridge to

5    increased usage on overlapping crops with one still being

6    herbicide and the other being a fungicide, in light of their

7    theory of mistake?

8            MR. GETZOFF:  That is a different gap to be crossed,

9    and I understand that they want to move to that gap.  That gap

10   is not -- the case law talks about the product.  If you have

11   different products, what's the chances that the senior user is

12   going to move into the other -- into the junior user's product,

13   and that distinction is fungicide/herbicide.  So faced with

14   that, there is no chance of that bridging, they move to, well,

15   but you have got overlapping crops that may increase.

16           So I would say, first, that's a different gap that

17   doesn't get you over the bigger gap, which these are still

18   fundamentally different products.  So you are still faced with

19   the problem of someone confusing an herbicide with a fungicide

20   which, given what these products do and why they are being

21   purchased, that's just not a mistake that farmers make, not if

22   they are going to stay in business.

23           But the only evidence we have of that, aside from what

24   they have done to date, is plans for the future.  They have a

25   plan to file for cucurbits.  They haven't filed yet.  EPA

C5g2ace3                     Summation - Mr. Getzoff

1   hasn't even started on that process because Bayer hasn't done

2   anything yet, but the testimony was we plan to do it on May 25.

3   Well, whether they -- this trial has been set for a long time.

4   If they wanted to get that going, I would have thought they

5   would have had that in the works before trial, so they could

6   say we are in the process.

7              THE COURT:  They did rice, they have added rice and

8   corn and cucurbits to come.

9              MR. GETZOFF:  But cucurbits hasn't been filed yet.  My

10  point on cucurbits is rice, corn, the row crops, fine, yes,

11  they have been added and those are row crops and we are not

12  worried about row crops.  Profine 75 isn't used on row crops.

13  If it wasn't for the fact that Gowan -- and this was in the

14  testimony, your Honor, the only reason the crop listings on

15  Profine 75 and Halomax 75 are the same as the crop listings on

16  the brand names that they are competing against, the Gowan

17  Permit and the Gowan Sandea, and as Mr. Feinman testified, they

18  are restricted -- their distributors, to be able to push this

19  product and convince their customer base, the growers, that

20  this is the ibuprofen alternative to Advil for half the price,

21  customers are still like the brand.  Some people still by Advil

22  even though it costs more.  And I, frankly, don't understand

23  why anyone would buy Advil, but I see it around, so people

24  still buy Advil.

25             You have to convince people that it is exactly the

1    same, and once you start having differences in the crops, you

2    hurt your ability to push it to farmers.  So that's why Profine

3    has crops listed that they don't expect to make any sales for,

4    because that's how Gowan has it.

5            Cucurbits, one point I want to make on the future

6    plans of Bayer to add vegetables, and this came out in

7    Dr. Myers' testimony is, this plan to add vegetables is not

8    because they expect to make sales to those vegetables.  It is

9    taking advantage of the system that EPA allows which is if you

10   add minor use crops, you can extend your exclusivity.  The name

11   of the game for the big six pesticide companies like Bayer is

12   you have got your 17 years of exclusivity, 15 years, whatever

13   it is, which means you enjoyed the monopoly power, which the

14   EPA encourages because you have a lot of investment to recoup,

15   but after that time, that's the balancing act.  We want the

16   generics to come in to lower the prices for the farmers, which

17   helps the consumers and helps everybody.  They get to extend

18   that monopoly by three years if they add cucurbits.

19           They can't stop with cucurbits.  As Dr. Myers said,

20   you have to add lots of minor use crops to get that three

21   years.  Cucurbits is the first.  But it's not because they

22   expect to start having Proline on the shelf with cucurbits

23   farms.  It is so that they can keep the generics out for three

24   years and maintain these hundreds of millions of dollars that

25   they get by being the monopoly.  So they are adding vegetables

1   which they say they are going to do, they haven't done it yet.

2   Again, doesn't affect the analysis because the reason they are

3   doing it isn't to make sales, it is to keep the generics out

4   for all the crops, which is what they are allowed to do under

5   FIFRA.

6           Let me move on to the good faith/bad faith.

7           THE COURT:  I should say you are at your time.  I have

8   kept you longer.  I will give Mr. Newbury some additional time

9   for his rebuttal if he wants it, but you should start wrapping

10  up.

11          MR. GETZOFF:  I will wrap up.

12          Your Honor, bad faith in a trademark case, when the

13  junior user has an intent to trade off the goodwill of the

14  senior user, it is copying.  It is a counterfeit type of claim

15  where they have got a product that's enjoyed, a lot of

16  commercial success, and I am going to ride their coattails.  I

17  am going to trade off of their goodwill and offer the same

18  product under a close-enough name that I can get away with and

19  try to confuse people, try to actually make people think I am

20  their product because that will boost my sales.  That is not --

21  there is not even a suggestion let alone evidence that that is

22  the case here.

23          Bayer spent a lot of time criticizing Ms. Cara Strazzo

24  for not being an attorney.  They overlook the fact the

25  trademark office did their own search.  The trademark office

C5g2ace3                     Summation - Mr. Getzoff

1    approved the mark for publication in light of all of the

2    registered marks that were in existence, including Proline.  So

3    they didn't criticize Ms. Strazzo for not being a lawyer and

4    not being a trademark expert.  They can't criticize the U.S.

5    Patent and Trademark Office for not being experts.  This is

6    what they do.  This is their statutory mandate, to perform a

7    likelihood of confusion analysis and only allow those marks

8    that pass that test.  That's what happened here.  And the

9    product was only sold after the mark was approved.

10           There is that second step.  It gets published for

11   opposition so someone like Bayer can come in, like they did

12   here, and say, We disagree with what the trademark office said.

13   We do think there is a likelihood of confusion, and we are

14   willing to fight that fight.  That's what happened here.  That

15   doesn't negate the fact that you had an independent, objective

16   expert, the trademark examiner, who did do a search, who did do

17   the analysis and concluded that there was no likelihood of

18   confusion.  That's Aceto's good faith.

19           We have already covered, your Honor, I think

20   everything else.  I was going to talk about -- go through the

21   scenario and break that apart, but I think we already covered

22   that in the course of the court's questioning.

23           Again, your Honor, Bayer's case is based on

24   possibilities.  Is this possible?  Could this happen?  Yes.

25   And we will readily admit that it is possible in the way that

c5g2ace3                        Rebuttal - Mr. Newbury

1    anything is possible, but that's not the standard.  The

2    standard is, is it likely?  Is it likely to happen?  And given

3    the 38 months of sales, the significant sales, these products

4    have been sold concurrently now longer than Bayer's mark was

5    sold on its own.  Bayer's mark was sold for about two years

6    before Aceto came in in 2009.  They are now both in their

7    fourth year of concurrent sales.  If likelihood of confusion

8    was -- if confusion was likely, we would have seen it by now.

9            Thank you, your Honor.

10           THE COURT:  Thank you.

11           Mr. Newbury, about ten minutes.  Does that sound --

12           MR. NEWBURY:  I don't think I need that much, your

13   Honor.

14           THE COURT:  Go ahead.

15           MR. NEWBURY:  I hope I don't, anyway.

16           Going here in reverse order, we never claimed there

17   was a possibility of confusion.  Our position from the get-go

18   has been that there is a likelihood of confusion.  That is

19   simply a red herring we throw out there.

20           Next, we heard a reference to the trademark examiner's

21   finding as being evidence of good faith.  It is just settled

22   that the fact that a trademark examiner didn't find likelihood

23   of confusion is entitled to no weight.  Otherwise, the

24   trademark law wouldn't even be set up with opposition

25   proceedings.  The whole purpose of the examination is to see if

c5g2ace3                        Rebuttal – Mr. Newbury

1    it can be even passed to publication, so that the parties that

2    might be damaged will then oppose.  If you want a citation for

3    that, I can give you *Kos Pharmacy v. Andrx Corporation,* 369

4    F.3d 700, 714-15 (3rd Cir. 2004).

5         To defend Dr. Myers, he did say one reason for going

6    to cucurbits was to get the extension with other products.  He

7    didn't say it was the only reason.  In fact, he did say they

8    fully expect to sell cucurbits.

9         There was a citation on the related goods to a case,

10   saying related goods depends how much they compete with the

11   other products.  That citation comes from a case in Aceto's

12   pretrial brief, and that case dealt with competitive products.

13   We are not dealing with competitive products here.  I am

14   looking for the citation.

15        THE COURT:  That was talking about proximity of the

16   market.

17        MR. GETZOFF:  That's correct, it was not.

18        THE COURT:  So that was the factor we were talking

19   about and the point that Mr. Getzoff made, citing the Second

20   Circuit case.

21        MR. NEWBURY:  That particular quotation, that case

22   deals with competitive products.  We are not talking about

23   competitive products here.  It has nothing to do with this

24   situation.  In the *Clinique* case from this district, 945

25   F.Supp. at 553, they talk about the factors being -- the

c5g2ace3                        Rebuttal — Mr. Newbury

1  factors for proximity being the class of customer -- consumers

2  to whom the products are sold, the manner of advertising, the

3  channels through which the goods are sold, and the extent to

4  which the goods or services fall within the same class or are

5  used together.  Those are the factors we relied on and they

6  showed proximity of the products.

7        Going to the strength of the mark, we have some

8  difficulty with the CEO's arguments.  First, as to our own

9  products using "pro," somehow weakening our mark, those are our

10 products.  There is not going to be any confusion there.  They

11 are Bayer products.  We are entitled to use whatever marks we

12 want on them.  Anyway, those marks don't have the overall

13 similarity of Proline and Profine.  They simply have nothing to

14 do with this case.  There is a similarity of Proline and

15 Profine.  We don't claim exclusive rights in "pro."  We claim

16 exclusive rights in Proline and that those rights are infringed

17 by the use of Profine.

18       The third-party uses that we are referring to, as I

19 said, there is no evidence as to any use as to the extent of

20 use.  Beyond that, they deal only with "pro."  They don't deal

21 with Proline.  The marks, you even heard testimony, there is

22 nothing there even close to the overall similarity of Proline

23 and Profine.  They simply cannot weaken the product.

24       Finally we heard the usual refrain, there is no

25 evidence of actual confusion.  But there was no addressing the

c5g2ace3                    Rebuttal - Mr. Newbury

1  fact of evidence of actual confusion is not necessary and is

2  considered difficult to obtain.

3           There was a mention that we didn't do a survey.

4  Surveys are sometimes used in complex cases.  This is not a

5  complex case.  The cost of a survey is very high and difficult,

6  and the time consumed in doing them and the services of an

7  expert, a choice was made not to do it in this case.  There are

8  case after case that says there is no requirement that you do a

9  survey.

10          The most interesting thing here in the entire closing

11  argument, we still heard no argument that the user of Profine

12  will not think it comes from the same company as Profine.  We

13  have heard a lot about you won't buy an insecticide when you

14  want a fungicide, but we haven't heard anything respecting that

15  confusion of source.  And that is the test for a likelihood of

16  confusion.

17          Thank you, your Honor.

18          THE COURT:  All right.  Thank you.

19          That concludes trial in this matter.  As I have

20  indicated, I would like post findings of fact and conclusions

21  of law from the parties.  We set a week from today for

22  simultaneous filing from each side, the following Monday for

23  any response or opposition to that, and I have asked for the

24  parties to come together and agree on a final submission to me

25  of all trial exhibits that were entered.  My deputy keeps

c5g2ace3

```
1    track, too, so once you come to your agreement, she will just
2    check her list.  But I will give you my binders to make the
3    copies now.  I think that's probably easier than having you
4    work on it and send it in.  If I am wrong about that, do as you
5    would like.
6             Anything further before I adjourn?
7             MR. BARENGOLTS:  No, your Honor.
8             MR. NEWBURY:  We thank you for your time, your Honor.
9             THE COURT:  Thank you.
10            MR. GETZOFF:  Likewise; thank you for your time and
11   attention, your Honor.
12            THE COURT:  I thank counsel for both sides for their
13   excellent presentations and arguments.
14            With that, we are adjourned.  The matter is submitted
15   to the court.
16                               - - -
17
18
19
20
21
22
23
24
25
```

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   Direct

 4   Cross By Mr. Newbury . . . . . . . . . . . . 230

 5   Redirect By Mr. Getzoff  . . . . . . . . . . 241

 6    RANDY A. MYERS

 7   Direct By Mr. Barengolts . . . . . . . . . . 242

 8   Cross By Mr. Getzoff . . . . . . . . . . . . 243

 9                    PLAINTIFF EXHIBITS

10   Exhibit No.                            Received

11    5   . . . . . . . . . . . . . . . . . . . 223

12    8   . . . . . . . . . . . . . . . . . . . 224

13    6   . . . . . . . . . . . . . . . . . . . 225

14    2, 3, and 4  . . . . . . . . . . . . . . . 226

15    11   . . . . . . . . . . . . . . . . . . . 228

16    27   . . . . . . . . . . . . . . . . . . . 229

17    . . . . . . . . . . . . 0

18

19

20

21

22

23

24

25
```