UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

ACETO AGRICULTURAL CHEMICALS CORP.,

                     Plaintiff and Counter-Defendant,

      -v-

BAYER AKTIENGESELLSCHAFT and
BAYER CROPSCIENCE LP,

               Defendants and Counterclaimants.

------------------------------------------------------------------X

> **USDC SDNY**
> **DOCUMENT**
> **ELECTRONICALLY FILED**
> **DOC #:**_____
> **DATE FILED:** JUL 3 0 2012

10 Civ. 1770 (AJN)

OPINION

ALISON J. NATHAN, District Judge:

## I.    INTRODUCTION

      In this action, the plaintiff Aceto Agricultural Chemicals Corporation ("Aceto") seeks a declaration pursuant to 28 U.S.C. §2201 that the use of its PROFINE 75 mark on its halosulfuron-based herbicide product does not infringe the rights that defendants Bayer Aktiengesellschaft and Bayer Cropscience LP (collectively, "Bayer") have in their PROLINE mark. Bayer counterclaims alleging that Aceto's use of its PROFINE 75 mark constitutes trademark infringement in violation of 15 U.S.C. §1114(1), unfair competition in violation of 15 U.S.C. §1125(a), and unfair competition under New York common law. A bench trial was held in this matter from May 15, 2012 to May 16, 2012.

      Upon all the proceedings had herein and the findings of fact and conclusions of law set forth below, the Court concludes that the evidence is insufficient to find that there is a likelihood of confusion between Aceto's PROFINE 75 mark and Bayer's PROLINE mark and, therefore, the relief requested by Bayer is DENIED and the relief requested by Aceto is GRANTED.

1

## II.   LEGAL STANDARD

Although Aceto commenced this action by suing for a declaration of non-infringement, as the party claiming infringement, Bayer bears the burden of proof. *See Starter Corp. v. Converse, Inc.*, No. 95-cv-3678, 1996 WL 694437, at *2 (S.D.N.Y. Dec. 3, 1996). In order for Bayer to prevail on any of its three claims, it must demonstrate, by a preponderance of the evidence, that Aceto's use of the PROFINE 75 mark is likely to cause confusion. *See Virgin Enter. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003); *Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34-35 (2d Cir. 1995); *Advance Magazine Pub., Inc. v. Norris*, 627 F. Supp. 2d 103, 113 (S.D.N.Y. 2008).

## III.   FINDINGS OF FACT

The following constitutes the Court's findings of fact in this case. While many of the findings of fact appear in this section of the Opinion, additional findings appear later in the Opinion as well.

### A.   The Dispute

Bayer and Aceto both manufacture, market, distribute, and sell pesticides throughout the United States. (Ct. Ex. 1) Bayer has manufactured, marketed, distributed and sold a prothioconazole-based fungicide in the United States under the trademark PROLINE since May 7, 2007. PROLINE is a registered trademark. (Ct. Ex. 1)

Among other products, Aceto manufactures, markets, distributes and sells two generic halosulfuron-based herbicides in the United States. (Tr. 89:15-23; 168:9-11) Aceto began to consider producing these herbicides after distributors indicated that a generic alternative to the branded halosulfuron-based herbicides on the market would likely be successful. (Tr. 163:9-25) Aceto came up with a name for each of these products: HALOMAX 75 and PROFINE 75.

"HALOMAX" is a reference to the active ingredient, halosulfuron, and to the consultant who introduced Aceto to the rice market, Max Hackworth.  "PROFINE" is a reference to the professional grade of the product and to the president of Aceto, Michael Feinman.  (Tr. 168:25-169:21)

In November 2008, a third-party consultant, at the behest of Aceto, searched the United States Patent and Trademark Office ("U.S.P.T.O.") online database for the terms "PROFINE" and "PROFINE 75" to determine whether "PROFINE 75" was available for use and registration. The search identified no conflicting marks.  (Ct. Ex. 1; Aceto Ex. 10; Tr. 146:25 - 148:2)  On December 16, 2008, unaware of Bayer's PROLINE trademark, Aceto filed an application with the U.S.P.T.O. to register the PROFINE 75 trademark for use on one of its halosulfuron-based herbicides.  (Ct. Ex. 1; Tr. 174:2-10; 202:2-4; 206:19-24)  On March 13, 2009, Aceto's trademark application was approved for publication by the U.S.P.T.O., meaning that a U.S.P.T.O. trademark examiner examined the application and determined that it met the statutory requirements for registration.  (Ct. Ex. 1)  Aceto began using the PROFINE 75 trademark in United States commerce on March 26, 2009.  (Ct. Ex. 1)

However, on June 19, 2009, Bayer filed a Notice of Opposition with the Trademark Trial and Appeal Board ("T.T.A.B.") against Aceto's application to register the PROFINE 75 trademark.  (Ct. Ex. 1)  Upon receiving notice of Bayer's Opposition, Aceto took steps to evaluate the merits of Bayer's opposition.  More specifically, Aceto researched Bayer's PROLINE product and consulted distributors about the likelihood of confusion of the two products.  (Tr. 175:17-19; 175:24 - 176:10; 205:22 - 206:2; 206:25 - 207:6; 208:15 - 209:5) Convinced that there was not a likelihood of confusion, Aceto filed a declaratory judgment action for noninfringement on March 5, 2010, which caused the opposition proceeding before the

3

T.T.A.B. to be suspended pending the outcome of this action. (Ct. Ex. 1)

### B.    Pesticides Background

Commercial farmers[1] utilize pesticides, also known as crop protection products, to protect and enhance their crop yields. (Tr. 180:24-25; 193:10-22) The term "pesticide" includes both herbicides, which destroy or inhibit the growth of plants (especially weeds), and fungicides, which destroy or inhibit the growth of fungus. (Ct. Ex. 1)

A commercial farmer cannot purchase PROLINE or PROFINE 75 directly from Bayer or Aceto. (Tr. 28:25; Tr. 173:25-174:1) Instead, both PROLINE and PROFINE 75 are sold to distributors, including Independent Agribusiness Professionals, Chem Nut Inc., Helena Chemical Co., and Winfield Solutions, LLC. (Ct. Ex. 1) Distributors then sell PROLINE and PROFINE 75 either directly to commercial farmers through the distributors' own retail locations or to independent retailers who then sell the pesticides to commercial farmers. (Ct. Ex. 1; Tr. 29:4-13)

When purchasing pesticides, commercial farmers generally purchase what they already know and use on their crops or what has been recommended to them by a specialist. Larger growers, for example, often hire professional consultants to scout their fields and recommend what products to apply and where. These consultants are experts and are often trained agronomists. (Tr. 91:19-92:24) After a consultant has scouted the fields, he or she generally makes a written report to the grower identifying what pesticides should be applied to which fields. (Tr. 125: 13-22) Commercial farmers may also rely on the advice of consultants working for Bayer who meet with large growers to advise them on Bayer products. (Tr. 93:3-94:14) Finally, a commercial farmer may get advice from his local retailer on what product to purchase and use. Retailers are not merely an outlet for crop protection products – they are specialists with experience in crop protection. (Tr. 96:9-17; 97:5-8)

---

[1] A commercial farmer is a farmer who grows crops for sale. (Ct. Ex. 1)

4

A commercial farmer does not walk into a retailer and select and purchase a product off of the shelf.  Instead, the typical retail location consists of a warehouse where all the products are stored in pallets from floor to ceiling.  The farmer goes into the main office of the retailer and orders the product that he already knows he wants or the product that the retailer has recommended.  The order is communicated to the warehouse and then either the product is loaded onto the grower's truck for transportation to the farm or it is provided to an applicator who will apply the product to the fields.  (Tr. 30:6-11; 31:22-32:10; 96:9-97:4)

PROLINE costs approximately $1,200 per 2.5 gallon container, and PROFINE 75 costs approximately $200 per 10 ounce container.  (Tr. 98:1-9; 171:21-172:2)  Because of the cost of crop protection products like PROLINE and PROFINE 75 and because commercial farmers rely on crop yields for their livelihood, farmers are very careful about the crop protection products that they purchase and apply to their crops.  (Tr. 98:6-9; 194:11-14)

Application of pesticides may occur in a number of ways.   Depending on the pesticide, the crop, the size of the fields to be treated, and the complexity of the grower's operation, growers may apply pesticides to their crops themselves.  (Tr. 33:7-10; 35:1-36:17)  Alternatively, a retailer may offer application services, in which case the grower not only purchases the crop protection product from the retailer, but also has the retailer apply the product to the grower's fields.  (Tr. 32:1-8)  Finally, pesticides may be applied by part-time or migrant workers.  These workers might be employed by the farmer or by the retailer or they may operate independently. (Tr. 124:3-20)

C.     **The PROLINE and PROFINE 75 Products and Packaging**

Every pesticide must be approved by and registered with the Environmental Protection

Agency ("E.P.A.") before it can be sold commercially in the United States  (Ct. Ex. 1)  The

E.P.A.'s approval and registration process for a pesticide involves a review of the label,

including the data underlying the statements in the label.  (Ct. Ex. 1)  Each sellable unit of a

pesticide must bear an E.P.A.-approved label and attendant instructions, which provide

information on the use, safe handling, storage, and impact of a pesticide.  (Ct. Ex. 1)  Both

PROLINE and PROFINE 75 containers bear such labels and instructions.  (Aceto Ex. 28 & 29)

As a legal matter, pesticides must be used according to label instructions.  (Ct. Ex. 1)  As a

practical matter, in order to use either PROLINE or PROFINE 75, the label instructions must be

reviewed because dosage rates and the manner of application vary depending on the crop to

which the respective pesticide is applied.  (Bayer Ex. A; Aceto Ex. 8; Tr. 120:20-25; 172:10-21)

PROLINE is a prothioconazole-based fungicide.  (Ct. Ex. 1)  It is a liquid and is sold in a

2.5 gallon container.  (Tr. 85:2-3, 7-9; Aceto Exhibit 29)  Every 2.5 gallon container of

PROLINE has an E.P.A.-approved label bearing the "BAYER" trademark, the name

"PROLINE" written across a large green and orange chevron shape, and the "O" of "PROLINE"

depicted as an orange swirl.  The word "PROLINE" appears in all capital letters and is followed

by "480 SC Fungicide."  Finally, at the bottom of the label, it says: "Produced for: Bayer

CropScience LP."  (Tr. 84:5-10; Aceto Exhibit 29)

By contrast PROFINE 75 is a halosulfuron-methyl-based herbicide.  It is sold in a 10

ounce bottle and is in the form of solid granules that must be mixed with water and active

solvents prior to application.  (Aceto Exhibit 28; Tr. 171:10-20)  Every PROFINE 75 container

bears an E.P.A.-approved label that is entirely black-and-white.  The label bears the name

6

"PROFINE 75" with "Herbicide" written above it. "PROFINE" is entirely in lower case letters. Below the product name is the tag line, "Your Sedge Solution." Finally, at the bottom of the label it says: "Manufactured for: Aceto Agricultural Chemicals Corporation." (Aceto Ex. 28)

### D.     The PROLINE and PROFINE 75 Markets

There is limited geographic overlap of the PROLINE and PROFINE 75 markets. PROLINE is primarily sold in the north Central Plains and in the Middle Central Plains, whereas PROFINE 75 is primarily sold in the Mid-Atlantic and in the South (Tr. 111:14-18; Aceto Ex. 11, 21, 25) However, there is some limited geographic overlap because PROLINE is marketed for use on peanuts, which are generally grown in the Southeast. (Tr. 50:5-7; 57:5-12; 65:7-9)

There is minimal overlap of the crops on which PROLINE and PROFINE 75 are applied. As of the time of the bench trial in this matter, the only crops approved for both PROLINE and PROFINE 75 are dry beans, corn, and rice. (Tr. 110:17-23) PROLINE's largest sales are for application to dry beans and sugar beets. (Tr. 73:12-15) While PROFINE 75 can be used on dry beans, corn, and rice, it is actually marketed for use on vegetable crops and not on row crops. Aceto's other halosulfuron-based herbicide, HALOMAX 75, is marketed for row crops. Because PROFINE 75 costs twice as much for the consumer as HALOMAX 75, it is unlikely that a commercial farmer would purchase the more expensive PROFINE 75 for application to his or her row crops. (Tr. 168:15-24; 183:15-23) Indeed, this is confirmed by Aceto's sales records, which do not show row crop farmers purchasing PROFINE 75. (Tr. 200:19 - 201:5) Thus, even though PROLINE and PROFINE 75 could both be applied to dry beans, corn, and rice, there is no indication that PROFINE 75 is in fact purchased for application to these crops.

Bayer intends to expand the PROLINE label registration to allow application to cucurbits, which are grown in the southern states from coast to coast. (Tr. 58:7-16) This could

7

mean further geographic and crop overlap with PROFINE 75.  However, the import of the addition of cucurbits vis-à-vis actual overlap with the PROFINE 75 market is unclear as at least one goal of this registration expansion is simply to extend the period of time for which Bayer holds a monopoly over prothioconazole.  (Tr. 57:13-58:6; 116:11-14; 118:11-19)

Significant volumes of both products have been sold since they were each introduced into United States commerce.  From 2007 to 2010, Bayer sold approximately $100 million worth of PROLINE to distributors.  (Bayer Ex G)  From 2009 to 2011, Aceto sold over $3 million worth of PROFINE 75 to distributors.  (Aceto Ex. 2, 3, 4)  As of the date of the bench trial in this matter, PROFINE 75 and PROLINE had coexisted in the United States market for thirty-eight months.  During this time, Bayer has not suffered any monetary loss as the result of Aceto's sales of PROFINE 75, and Bayer's market for PROLINE has not been impacted by Aceto's sales of PROFINE 75.  (Tr. 123:18-23)

## IV.    CONCLUSIONS OF LAW

Resolution of the instant action requires the Court to determine whether Aceto's use of its PROFINE 75 mark is likely to cause confusion.  In determining whether there is a likelihood of confusion, courts in the Second Circuit apply the eight-factor balancing test introduced in *Polaroid Corp. v. Polaroid Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961).  The eight factors are: 1) the strength of the senior mark; 2) the similarity of the senior and junior mark; 3) the proximity in the market of the products to which these marks are attached; 4) the likelihood that the senior mark holder will "bridge the gap" between its product and the junior mark holder's product; 5) evidence of actual consumer confusion; 6) the junior mark holder's intent or bad faith in adopting its mark; 7) the quality of the junior mark holder's product; and 8) the sophistication of the relevant consumer.  *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 162 (2d

8

Cir. 2004) (citing *Polaroid Corp.*, 287 F.2d at 495).

The application of the Polaroid test is "not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Star Indus., Inc. v. Barcardi & Co. Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005). Moreover, "[n]o one of the Polaroid factors is dispositive, and the list is not exhaustive." *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir. 1997). Finally, the likelihood of confusion analysis is exactly that – it looks at whether confusion is *likely* not whether it is merely *possible*. *Star Indus., Inc*, 412 F.3d at 383 (In order to establish a likelihood of confusion "a plaintiff must prove . . . a probability of confusion, not a mere possibility, affecting numerous ordinary prudent purchasers.").

Bayer sets forth two theories of confusion: (1) product confusion (*i.e.*, that a farm worker or pesticide applicator will mistakenly apply PROFINE 75 to crops when in fact he is supposed to apply PROLINE), and (2) source confusion (*i.e.*, that a consumer would be confused into thinking that PROFINE 75 is a Bayer product).[2] (Tr. 245:6-25)

### 1.     Strength of the PROLINE Mark

The strength of the mark factor is largely relevant to source confusion. This factor "is determined by its tendency to uniquely identify the source of the product[, and t]his tendency is strong to the extent that the mark is distinctive, either inherently or by virtue of having acquired [distinctiveness]." *Star Indus., Inc.*, 412 F.3d at 384. Thus, in determining the strength of a mark, courts look to both "inherent distinctiveness" and "acquired distinctiveness." *Gross v. Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 185 (S.D.N.Y. 2008).

---

[2] The text of 15 U.S.C. § 1125(a)(1)(A) refers only to source confusion. However, 15 U.S.C. §1114(1) reaches beyond source confusion. *See Syntex Lab., Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 568 (2d Cir. 1971) (noting that §1114 outlaws the use of trademarks "which are likely to cause confusion, mistake, or deception of any kind, not merely of purchasers nor simply as to source of origin.").

In conducting the inherent distinctiveness analysis, courts place the mark on a scale from least distinctive to most distinctive: "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary or fanciful." *Gross*, 641 F. Supp. 2d. at 185. A mark is arbitrary "if there is no logical relationship whatsoever between the mark and the product on which it is used." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 216 (2d Cir. 1999). A fanciful mark is a made-up term. *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir.1993). By contrast, generic marks are marks "consisting of words that indentify the type or species of goods or services to which they apply and are totally lacking in distinctive quality." *Gross*, 641 F. Supp. 2d. at 185. "A mark is descriptive if it describes the product's features, qualities, or ingredients in original language or describes the use to which the product is put." *Id.* Finally, a mark is suggestive "if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods." *Id.*

Bayer's PROLINE mark, as a whole, is suggestive. The prefix "PRO" is descriptive, referring to the active ingredient, prothioconazole. (Tr. 98:17-18) The suffix "LINE" is neither arbitrary nor fanciful but is more than descriptive. Ultimately, the mark as a whole is suggestive because it requires thought and perception to connect the mark with the fungicide product. *See Gross*, 641 F. Supp. 2d. at 186 (finding that the "MD Formulations" mark for a skincare line was suggestive because it did not "conjure the image of a skincare product" and "require[s] imagination to relate [the mark] to skincare products.").

However, "suggestiveness is not necessarily dispositive of the issue of the strength of the mark." *Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 581 (2d Cir. 1991). Instead, the court must consider acquired distinctiveness; that is, the court must evaluate the suggestive mark's origin-indicating quality and, therefore, its strength. *Id.* Relevant to this analysis is the length of time that the senior mark has been in use on the product, evidence of advertising

expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the product, and the product's commercial success. *See, e.g.*, *Advance Magazine Pub., Inc.*, 627 F. Supp. 2d at 116.

The evidence adduced at trial indicates that the PROLINE mark is at least moderately strong. PROLINE has been marketed since 2007, during which time Bayer has sold in excess of $100 million worth of the product. Moreover, during PROLINE's first two years on the market, Bayer spent more than $1.6 million marketing it. Finally, PROLINE has received some independent media attention. (Ex. R) Given this evidence, the Court concludes that PROLINE is a suggestive mark with notable market recognition, thereby making it a moderately strong mark.

### 2. Similarity Between the PROLINE and the PROFINE 75 Marks

"When evaluating the similarity of marks, courts consider the overall impression created by a mark. Each mark must be compared against the other as a whole; juxtaposing fragments of each mark does not aid in deciding whether the compared marks are confusingly similar." *Brennan's Inc. v. Brennan's Restaurant, LLC*, 360 F.3d 125, 133 (2d Cir. 2004) (citations omitted). Moreover, the court should examine the similarity of the marks in terms of appearance, sound, and meaning. *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 528 (S.D.N.Y. 2011). Finally, "[t]he fact that the two marks appear similar is not dispositive. Rather, the question is whether such similarity is more likely than not to cause consumer confusion." *Brennan's Inc.*, 360 F.3d at 133.

Bayer makes two arguments regarding the similarity of the marks. First, Bayer argues that because of its broad use of the prefix "PRO" in its product names, consumers who simply hear the name PROFINE 75 or see it written down outside of its label context will assume that

11

PROFINE 75 is a Bayer product. (Bayer Concl. Law ¶¶ 60, 79) Second, Bayer argues that

because pesticide application decisions are often made based on oral or written recommendations

or directives, the similarity in sound and spelling of the marks will cause a farm worker or

pesticide applicator to mistakenly apply one product in place of the other. (Bayer Concl. Law ¶

74)

Unquestionably, "PROLINE" and "PROFINE" are spelled nearly identically and sound

highly similar and both use the same prefix. For several reasons, however, the Court concludes

that these similarities are not sufficient to suggest a likelihood of confusion. First, Bayer

presented no evidence that consumers perceive, or are likely to perceive, that the prefix "PRO",

in and of itself, indicates a Bayer product. In fact, Aceto presented evidence that there are

numerous other registered pesticides made by companies other than Bayer that utilize the prefix

"PRO" in their product name. (Aceto Ex. 27)

Additionally, the similar sound and spelling of the marks must be considered in the

context of the significant visual differences between the labeling of each product and the clear,

product-indicating content of the attendant instructions. Similarity in sound and spelling of the

marks may be outweighed by visual packaging differences. For example, in *Starbucks Corp. v.

Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 106 (2d Cir. 2009), the Second Circuit found that the

similarity in sound and spelling of "Starbucks" and "Charbucks" was not determinative because

the packaging of the two products differed in imagery, color and format and because the

packaging clearly included the manufacturer's name.

Here, although "PROLINE" and "PROFINE 75" are certainly similar in sound and

spelling, their packaging differs in imagery, color and format. The packaging also clearly

indicates the name of the respective manufacturer. More specifically, the PROLINE label

12

features a large green and orange chevron shape, the word "PROLINE" appears in all capital letters, the "o" is a stylized design, all the letters in "PROLINE" are orange, "PROLINE" is followed by "480 SC Fungicide," the Bayer mark is prominently featured above the word "PROLINE," and at the bottom of the label it says, "Produced for: Bayer CropScience LP." By contrast, the PROFINE 75 label is entirely black-and-white, the word "PROFINE" is in all lower case letters, above "PROFINE" is the word "Herbicide" and below it is the tag line "Your Sedge Solution" and at the bottom of the label it says, "Manufactured for: Aceto Agricultural Chemicals Corporation." Given these notable differences in packaging and, in particular, the fact that the Bayer mark is prominently displayed on the Bayer product and not on the Aceto product, the similar sound and spelling of the marks alone is not likely to confuse commercial farmers into believing that PROFINE 75 is a Bayer product.

Moreover, as discussed above, neither PROLINE nor PROFINE 75 can be applied to a crop without someone having first viewed the product label and read the instructions attached thereto. Indeed, reading these instructions is necessary to know how to mix the pesticide and what the proper dosage rate is for the particular crop being sprayed. Thus, simple similarity in sound and spelling, while perhaps relevant under other factual circumstances, is less salient here because the user's review of the label and the attendant instructions cannot be avoided.

Once the actual labels and attendant instructions are considered, it becomes clear not only that the packaging of the two products is visually dissimilar, but also that the attendant instructions contain sufficient information to indicate that the products serve significantly different purposes. Both the labels and the attached instructions clearly indicate whether the product is an herbicide or a fungicide and what pests the product is meant to treat. Consequently, it is highly unlikely that an individual viewing either product label and reviewing

the product instructions would nonetheless fail to notice that the pesticide they were mixing

treats, for example, weeds and not diseases.

In sum, the visual differences in the packaging of the two products, including the

instructions that form part of the labeling, are of greater consequence than the shared "PRO"

prefix of the marks or the similarity in sound and spelling of the marks and weigh against finding

a likelihood of confusion.

### 3. The Proximity in the Marketplace of the PROLINE Product and the PROFINE 75 Product and the Likelihood that PROLINE Will Bridge the Gap

"The proximity inquiry asks to what extent the two products compete with each other."

*Brennan's Inc.*, 360 F.3d at 134.  In order to assess proximity, courts look at both the nature of

the products themselves and the structure of the relevant market. *Id.* (citing *Vitarroz Corp. v.*

*Borden, Inc.*, 644 F.2d 960, 967 (2d Cir. 1981)).  That is, courts look both at market proximity

(*i.e.*, whether the two products are in related areas of commerce) and geographic proximity (*i.e.*,

the geographic separation of the products).  "Both elements seek to determine whether the two

products have an overlapping client base that creates a potential for confusion." *Id.*  If the

products are not already in the same market, the court may consider the likelihood that the senior

mark holder will enter the junior mark holder's market in the future, thereby "bridging the gap"

between the two products. *Star Indus., Inc.*, 412 F.3d at 387.

Proximity is relevant to source confusion because there is no "overlapping client base

that creates a potential for confusion" if a farmer who purchases PROLINE is not likely to also

purchase PROFINE 75.  Similarly, proximity is relevant to product confusion because a farm

worker can only mistakenly apply one product in place of the other if both products are found on

the same farm, which, in turn, is only likely to occur if both products are sold in the same

geographic areas and to the same farmers.

There is, on a macro-level, market proximity between PROLINE and PROFINE 75 because they are both pesticides used by commercial farmers and, on a national level, both are sold through the same trade channels.  Moreover, while PROLINE is a fungicide and PROFINE 75 is an herbicide, Bayer manufactures, markets, and sells both types of pesticides, thereby increasing, in theory, the plausibility of the assumption that PROFINE 75 is a Bayer product. However, this thirty-thousand foot view of proximity is of limited import because, for the reasons discussed below, neither source confusion nor product confusion is likely to occur if the same farmers in the same geographic areas do not purchase and use both products.

Minimal evidence was presented that PROLINE and PROFINE 75 are sold in the same geographic areas, purchased by the same farmers or stored on the same farms.  First, PROLINE is primarily sold in the north Central Plains and in the Middle Central Plains, whereas PROFINE 75 is primarily sold in the Mid-Atlantic and in the South.  Second, even where there is some geographic overlap in sales, the evidence presented at trial suggests that it is unlikely that the same farmer would buy both products.  That is, PROLINE and PROFINE 75 are primarily applied to different crops and, even for the overlap row crops, a farmer would not likely purchase or use both products because he would use the lower cost HALOMAX 75 that is marketed for such crops and not PROFINE 75.  Third, while Bayer presented some evidence that farmers raising crops on which PROLINE is applied could, as the result of crop rotation, also potentially raise crops on which PROFINE 75 is applied, Bayer presented no evidence as to how often this actually occurs or how likely it would be to occur.  More to the point, Bayer presented no evidence that pesticides are stored from one growing season to another, meaning that the Court has no basis to conclude that a farmer raising a PROFINE 75 crop would still have PROFINE 75

15

stored on his farm the next season when he was growing a PROLINE crop. Finally, the Court

notes that Bayer's witness was not personally aware of any farm on which both products are

stored, and he could not opine on the probability that both products would be used on the same

farm. (Tr. 130:2-5, 17-23)

Bayer has also made a "bridging the gap argument," noting that PROLINE will soon

extend its registration to include cucurbits which are not only an overlap crop with PROFINE 75,

but are also grown in the southern states where PROFINE 75 is largely sold and applied. It is

possible that, in the future, a farmer raising cucurbits will purchase and use both products;

however, Bayer has presented no evidence enabling the Court to evaluate the likelihood of this

occurring. What is more, Bayer's witness testified that one of the primary reasons for adding

cucurbits to PROLINE's registration was simply to extend the period of time during which Bayer

had the exclusive right to market and sell prothioconazole-based pesticides. In other words, it is

not clear that Bayer will actually market PROLINE to cucurbit farmers or that Bayer anticipates

that cucurbit farmers will actually use PROLINE.

In sum, Bayer has, at most, presented evidence that overlap of the PROLINE and

PROFINE 75 markets is *possible*. However, evidence of actual overlap, or at least the

probability thereof, is essential to a finding that either source confusion or product confusion is

likely to occur. In light of the plain inadequacy of the evidence on this point, the Court finds that

this factor weighs against finding a likelihood of confusion.

### 4.     Evidence of Actual Confusion

Evidence that confusion has actually occurred is of course convincing evidence that

confusion is likely to occur. *Morningside Grp. Ltd. v. Morningside Capital Grp., LLC*, 182 F.3d

133, 141 (2d Cir. 1999). While proof of actual confusion is not required, "the complete absence

of actual confusion evidence after a significant period of competition may weigh in a [junior mark holder's] favor." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986).   At the time of trial, PROLINE and PROFINE 75 had coexisted in the pesticide market for thirty-eight months without a single instance of product confusion reported to Bayer or Aceto.  Bayer argues that this is too short a period of time to draw any conclusions vis-à-vis the likelihood of confusion inquiry.  (Bayer Concl. Law ¶)  The Court agrees that this factor is not dispositive but notes that the absence of actual confusion at least weighs slightly against finding a likelihood of confusion.

### 5.      Evidence of Bad Faith

"Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products." *Star Indus.*, 412 F.3d at 388.  The evidence shows that Aceto was unaware of the PROLINE mark when it developed its PROFINE 75 mark, that Aceto engaged a third party to perform a trademark search prior to use of the PROFINE 75 mark in commerce, that Aceto registered the PROFINE 75 mark with the U.S.P.T.O. prior to using the mark in commerce and, finally, that when Aceto was confronted with Bayer's opposition to registration of the PROFINE 75 mark, it took steps to evaluate the merits of Bayer's opposition. Bayer nonetheless argues that Aceto acted in bad faith by adopting the PROFINE 75 mark because (1) it did not confer with an *attorney* prior to registration, (2) its consultant conducted an inadequate trademark search prior to registration, and (3) after receiving notice that Bayer opposed registration of the PROFINE 75 mark, Aceto proceeded with its use of the PROFINE 75 mark.  The Court disagrees.

First, although Aceto did not consult an attorney, it did engage a consultant to perform a

17

trademark search prior to beginning use of the PROFINE 75 mark.  None of the cases cited by

Bayer support its claim that Aceto's failure to consult an attorney, in and of itself, constitutes bad

faith.  (*See* Bayer Concl. Law ¶88)  In *The Sports Authority, Inc. v. Prime Time Hospitality

Corp.*, 89 F.3d 955, 964 (2d Cir. 1996), the Second Circuit noted that "[g]ood faith can be found

if a defendant has selected a mark which reflects the product's characteristics, has requested a

trademark search or has relied on the advice of counsel." (citation omitted).  Not only does

*Sports Authority* not require a finding of bad faith simply by virtue of a party's failure to consult

an attorney, but it allows a finding of *good faith* where a trademark search has been conducted.

The other two cases cited by Bayer, *V&S Vin & Sprit Aktiebolag v. Absolute Publishing

USA Inc.*, No. 05-cv-4429, 2006 WL 197001 (S.D.N.Y. Jan. 25, 2006) and *ABC Rug & Carpet

Cleaning Service, Inc. v. ABC Rug Cleaners, Inc.*, No. 08-cv-5737, 2011 WL 182114 (S.D.N.Y.

Jan. 13, 2011) involve findings of bad faith but neither does so based on a failure to consult an

attorney.

As to Bayer's second point, that the consultant's search was inadequate, there is no basis

for concluding that the use of only the terms "PROFINE" and "PROFINE 75" in Aceto's

consultant's trademark  search renders the search inadequate and warrants a finding of bad faith.

In *Star Industries*, the Second Circuit noted:

> This Court has never held adoption of a mark with no knowledge of a prior similar mark
> to be in bad faith even in the total absence of a trademark search, much less on the basis
> of an allegedly flawed trademark search. Furthermore, in some cases even where a
> trademark search resulted in knowledge of the earlier mark, in the absence of additional
> evidence indicating an intent to promote confusion or exploit good will or reputation, this
> Court has found the junior user to be in good faith.

412 F.3d at 388 (citations omitted).  Both of Aceto's witnesses testified that they were not aware

of Bayer's PROLINE mark prior to registration of the mark.  The Court credits this testimony.

Moreover, Aceto conducted a trademark search and received a trademark registration prior to

using the PROFINE 75 mark in commerce.  In light of these facts and the Second Circuit's holdings in *Star Industries*, the Court cannot conclude that the scope of Aceto's trademark search warrants a finding of bad faith.

Finally, as to Bayer's third point, Aceto's continued use of the PROFINE 75 mark after receipt of Bayer's opposition does not constitute bad faith because Aceto adopted the PROFINE 75 mark before it knew of the PROLINE mark and because even after receiving notice of Bayer's opposition, Aceto had a good faith belief that its mark did not infringe Bayer's PROLINE mark.  Aceto's witnesses testified that, following receipt of Bayer's opposition to the PROFINE 75 registration, they took steps to investigate Bayer's position.  These steps included researching the PROLINE product and consulting distributors.  According to Aceto's witnesses, they concluded that confusion of the two products was unlikely based on a variety of differences between the two products.  Moreover, they felt that their conclusion was reinforced by conversations with distributors and by the fact that the U.S.P.T.O. had approved the PROFINE 75 mark for publication.  The Court credits the Aceto witnesses' testimony that they did not believe that the PROFINE 75 mark infringed the PROLINE mark and therefore declines to find that Aceto acted in bad faith when it continued to use the PROFINE 75 mark after receiving notice of Bayer's opposition.

In sum, the Court does not find that Aceto adopted and/or used the PROFINE 75 mark in bad faith.

### 6.    The Quality of Aceto's PROFINE 75 Product

There is no contention that Aceto's product is of inferior quality when compared with Bayer's product.  (Bayer Concl. Law ¶ 91)  "However, it is the loss of control over quality that is the real gravamen of this factor."  *U.S. Polo Ass'n, Inc.*, 800 F. Supp. 2d at 537.  "A senior user

is not required to put its reputation in a junior user's hands, no matter how capable those hands may be." *Id.* Thus, "a senior user may sue to protect his reputation even where the infringer's goods are of top quality." *Id.* (quoting *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259, 260 (2d Cir. 1987)). Bayer asserts that it faces significant harm to its reputation if PROFINE 75 is accidentally applied to crops in place of PROLINE because such a mistake would have devastating effects on crops, which a grower would in turn blame on Bayer. The Court credits the testimony of Bayer's witness regarding the harm that such a mistake poses to Bayer's reputation. The Court notes, however, that this testimony goes to the harm that confusion can cause rather than the likelihood that such confusion will occur. *See Virgin*, 335 F.3d at 152.

### 7.   The Sophistication of the Relevant Consumer Group

"The degree of sophistication of consumers can have an important bearing on likelihood of confusion. Where the purchasers of a product are highly trained professionals, they know the market and are less likely than untrained consumers to be misled or confused by the similarity of different marks." *Virgin*, 335 F.3d at 151.

Commercial farmers are the consumers of crop protection products, and the evidence adduced at trial demonstrates that they are sophisticated consumers who carefully select crop protection products for purchase and application. These farmers invest significant amounts of money in crop protection products each growing season and depend on their crop yields for their livelihood. In light of the significant differences between the packaging of PROLINE and PROFINE 75 discussed above, *supra* § IV.2, and the serious consequences of mistakenly applying one product rather than the other, it is unlikely that a commercial farmer would confuse the two products merely because of their similarity in sound and spelling.

Perhaps in recognition of this point, Bayer focuses not on the consumer of crop protection products but on the "end user." (Bayer Concl. Law ¶ 94)  Bayer argues that the end users of these products are farm workers or pesticide applicators who may be seasonal workers. (*Id.*)  On the basis of their status as seasonal workers, Bayer asks the Court to conclude that these workers are likely to confuse PROLINE with PROFINE 75.  The Court declines to reach this conclusion given that Bayer has presented no evidence that these workers are unsophisticated, incompetent, or unable to read and follow the instructions attached to every container of PROLINE and PROFINE 75 or that they are not otherwise supervised by sophisticated and competent employers.  Indeed, Bayer's witness conceded that he had no basis to suggest that retailers or commercial farmers employ incompetent workers.  (Tr. 124:21 - 125:3)

In sum, the Court concludes that the commercial farmers who purchase PROLINE and PROFINE 75 are sophisticated and not likely to make a casual purchase or application decision such that these two products would be confused.  While the Court recognizes that the farmers generally do not personally apply pesticides to their crops, there is no evidence that the individuals who actually make such applications are sufficiently unsophisticated or careless to render confusion of PROLINE and PROFINE 75 likely.

### 8.   Balancing the Factors

In the end, the *Polaroid* factors must be considered in light of two ultimate questions: (1) are consumers likely to be confused as to the source of PROFINE 75, and (2) are the individuals who apply pesticides to crops likely to confuse PROLINE with PROFINE 75 and accidentally apply one in place of the other.  Importantly, the Court must evaluate the *probability* of either type of confusion occurring and not simply the *possibility* thereof.  *See Star Indus., Inc*, 412 F.3d at 383.  On balance, for the reasons discussed above, the *Polaroid* factors do not support a

finding of likelihood of confusion between Aceto's PROFINE 75 mark and Bayer's PROLINE mark under either of Bayer's theories.

**V.     CONCLUSION**

For the foregoing reasons, the Court finds that Bayer has failed to establish a likelihood of source confusion or product confusion, and therefore has failed to establish trademark infringement in violation of 15 U.S.C. §1114(1), unfair competition in violation of 15 U.S.C. §1125(a), or unfair competition under New York common law.  The Court therefore directs the clerk to enter judgment in favor of Aceto and to close this case.

SO ORDERED.

Dated:  July 30, 2012
        New York, New York

ALISON J. NATHAN
United States District Court Judge